## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

_____

LEONYER M. RICHARDSON      :      Civil No. 3:02CV0625(AVC)
          Plaintiff      :
                        :
    vs.                 :
                        :
STATE OF CONNECTICUT      :
COMMISSION ON HUMAN RIGHTS,  :
OFFICE OF POLICY AND      :
MANAGEMENT, CFEPE-AFT,    :
AFL-CIO, ET AL.          :
          Defendants    :      JUNE 7, 2004

_____

## DEFENDANTS' RULE 56(a)1 STATEMENT OF MATERIAL FACTS

1.      The plaintiff, Leonyer Richardson, is a resident of the State of Connecticut.  (Ex. 76, p. 2, #4).

2.      Before her employment by the State of Connecticut, the plaintiff was a drill sergeant in the U.S. Army.  (Ex. 111).

3.      Cynthia Watts Elder is an African American female who from March 1999 until 2004, served as the Executive Director of the Connecticut Commission on Human Rights and Opportunities (hereinafter "CHRO").  (Ex 105, Affidavit of Cynthia Watts Elder, dated June 4, 2004, ¶ 3).

4.      Plaintiff began her state employment with the Department of Environmental Protection ("DEP"), where she was reprimanded on October 30, 1996 for threatening a co-worker, Ms. Smith (Ex. 52 ).

5.      Plaintiff was also suspended for three days without pay on August 12, 1997 by DEP Chief Richard Clifford for threatening another co-worker, Ms. Kopacz.

(Ex. 54; Exhibit 109, Excerpt from Deposition of Leonyer Richardson, dated December 11, 2002, pp. 12-18).

6.      Prior to her employment at the CHRO, Watts Elder first worked at DEP and then moved to the Office of Policy & Management ("OPM") in October 1996. (Ex. 105, ¶ 4).

7.      Watts Elder met Leonyer Richardson when she was employed by DEP and considered her to be a casual acquaintance. (Ex. 105, ¶  5).

8.      In October 1996, Watts Elder moved from DEP to OPM.  After she moved to OPM,  Richardson contacted her and indicated that she was applying for a position. Watts Elder was unaware at the time of any performance or behavioral problems Richardson had while at DEP.  (Ex. 105,  ¶ 6).

10.      Richardson  did not share with Watts Elder the fact that she had been disciplined while at DEP for behavioral problems. Watts Elder gave Richardson a reference for a position at OPM. (Ex. 105, ¶ 6).

11.      Richardson was hired by OPM in its business office. Watts Elder did not have daily business contact with her before she subsequently left OPM to assume the Executive Director position at the CHRO.   (Ex. 105, ¶ 7).

12.      In early December 1997, the plaintiff, who was still employed at that time by DEP as a Fiscal Administrative Officer (FAO), was allowed to transfer to the Office of Policy and Management ("OPM") in the same position ("FAO").  (Ex. 76, p. 5, p. 18).

13.      Within days of plaintiff's transfer to OPM, on December 15, 1997, the plaintiff actually reprimanded her own supervisor (Ms. Elaine Shew) for allegedly

refusing to train her and for "approaching [her] in a hostile manner."  (Ex. 1, p. 2, ¶¶ 9, 10).

14.     Shortly after plaintiff's transfer to OPM, she claimed to be the victim of a "hate crime" because her desk had been "ramshacked" [sic] for three months, but all it turned out to be was the private cleaning company in her building had accidentally dragged the cord of their vacuum cleaner across her desk on occasion, thus moving some of the personal items on her desk.  (Ex. 1, ¶ 6;  Ex. 5, p. 1; Ex. 109, Excerpts from deposition of Leonyer Richardson, dated December 11, 2002,  pp. 28-31, pp. 32:7-35:9).

15.     On May 30, 2000, the plaintiff filed a complaint of discrimination (#0010435) against OPM (which was later amended), in which she again alleged being the victim of a "hate crime" concerning her desk (Ex. 1, ¶ 16) and further alleged that her supervisors discriminated against her based on her race by harassing her in various ways on the job.  (Ex. 1).

16.     On August 18, 2000, the defendant, OPM, filed a detailed comprehensive answer to Complaint #0010435 in which it denied every one of her discrimination claims, and documented the plaintiff's false accusations and insubordinate behavior.  (Ex. 5).

17.     In 2000, Watts Elder received a call from OPM informing her that the agency had repeated problems with Richardson's performance and behavior. Richardson would accuse other employees of acts that were unsubstantiated, did not follow directions and generally created a tense and disruptive environment within the OPM business office. (Ex. 105, ¶  8).

18.     Watts Elder was very embarrassed to hear this information about Richardson because she had recommended her to OPM.  (Ex. 105, ¶  9).

19.    In order to provide Richardson with a fresh start, Watts Elder agreed to accept her as a transfer employee from OPM to CHRO.  Richardson began at the CHRO on October 6, 2000 and was assigned as a fiscal officer in the CHRO business office under supervision of the Business Manager, Ms. Leanne Appleton.  (Ex. 105, ¶ 10).

20.    The plaintiff accepted a transfer from OPM to the Commission on Human Rights and Opportunities ("CHRO") and withdrew her Complaint #0010435.  (Ex. 7). The plaintiff then unsuccessfully attempted to rescind her withdrawal of Complaint #0010435. (Exhibits 8-12).

21.    The timing of Richardson's transfer to OPM  did not coincide with the budget process, so OPM agreed to fund Richardson's position at the CHRO for the remainder of the fiscal year.  At all times Richardson was a CHRO employee and except for simply funding the position, OPM did not exercise any control or direction over Richardson's job. She was assigned work and supervised entirely by CHRO employees. No one at OPM ever tried to influence Watts Elder about anything to do with the plaintiff, her discipline or her eventual termination.  (Ex. 105, ¶ 11).

22.    Ms. Appleton is a highly competent business manager. She knows her job and the regulations governing business operations for state agencies.  Her style is very direct and she is perceived by some to be a stickler for the rules and procedures.  (Ex. 105, ¶ 12).

23.    Within a short time after transferring from OPM to the CHRO on October 6, 2000, the plaintiff began to exhibit the same misbehaviors which had caused her problems with OPM.  (Ex. 47; Ex. 105, ¶ 13).

24.    On February 22, 2001, the plaintiff's manager, Leanne Appleton, issued

plaintiff a written warning for violating the security of the computer system, using

another employee's user-id and password to access the system in order to make changes.

Appleton reminded the plaintiff that on January 25, 2001, she spoke to her about using a

different format and correction form for Appleton's review and ultimate approval, and

that making changes to the appropriated balances without consulting her amounted to

defying her orders.  (Ex. 47; Ex. 101, p. 2, ¶ 2; Ex. 105, ¶ 16).

     25.    Appleton informed the plaintiff that she was scheduling a meeting on

March 2, 2001 to discuss work requirements, and that they would continue to meet on

Friday mornings.  Appleton informed the plaintiff she had the right to union

representation at any or all of the meetings, and reminded her that the Employment

Assistance Program existed to assist her to deal with personal issues that impact her

personal life and interferes with her work performance.  (Ex. 101, p. 2, ¶ 2).

     26.    On April 6, 2001, Appleton issued the plaintiff a written warning for

violating a direct order on February 22, 2001 not to contact the comptrollers, DOIT or

any state agency without her consent or knowledge.  She informed the plaintiff that the

comptroller's office told her the plaintiff contacted that office and informed them she had

just been assigned deposit slips and should be the contact.  Appleton reminded the

plaintiff that all issues regarding the financial reporting of the agency were Appleton's

responsibility.  Appleton also warned the plaintiff for unacceptable behavior in sending

her an e-mail about the deposit slip issue, making a telephone call to Appleton and then

hanging up on her, and leaving rude notes concerning Appleton's correction of the

plaintiff's time card, when the plaintiff made an error in charging time off.  (Ex. 46; Ex.

101, p. 2, ¶ 3).

27.     The plaintiff filed a grievance on April 30, 2001, accusing the employer of issuing a written warning without just cause, and accusing her supervisor of abusive, arbitrary, and discriminatory conduct.  (Ex. 101, p. 3, # 4).

28.     In May 2001, the plaintiff and Appleton exchanged several e-mails about the energy consumption reports and the corrected versions.  Appleton had warned the plaintiff she was not using the appropriate method of calculating energy consumption use and the plaintiff replied she was calculating energy consumption correctly.  By May 30, 2001, Appleton and the plaintiff's versions of the corrected reports did not match and Appleton e-mailed the plaintiff to say they would discuss the problem the next day with the plaintiff's union steward.  The plaintiff replied that she was doing them correctly, relying on her method of reporting in the past.  Appleton again e-mailed the plaintiff and stressed it was the present reports that are being done to the present that she was concerned about.  (Ex. 101, p. 3, ¶ 5; Ex. 105, ¶¶ 19-20).

29.     Appleton again replied to the plaintiff on May 30, 2001, and told the plaintiff to review the costs per unit on each of the bills referenced; that the price per unit that she used in her calculations was not the price per unit stated on the bill or used to charge the agency calculated by Broadcannon.  She informed the plaintiff that she had asked OPM to review the reports with her for accuracy, and she would let the plaintiff know if any corrections must be done once they had been reviewed.  (Ex. 101, p. 3, ¶ 6; Ex. 105, ¶¶ 20-21).

30.     On June 21, 2001, the plaintiff informed Appleton that she had completed the energy consumption monitoring report for the month.  (Ex. 101, p. 3, ¶ 7).

31.     On June 22, 2001, Appleton e-mailed the plaintiff informing her she had reviewed and confirmed with the OPM that the method the plaintiff had been using was incorrect.  She told the plaintiff the correct method is the total cost from Broadcannon divided by the cost per kwh. (.104106 from the 5/5/01-6/5/01 billing cycle) and to use the method in her future calculations.  (Ex. 101, p. 3, ¶ 8; Ex. 109: p. 70:3-16).

32.     The plaintiff e-mailed Appleton on June 22, 2001, informing her she did the report(s) correctly, that Appleton continued to falsely accuse her of doing her work wrong when there is no proof of her accusation, and calculated an example of how she did the report of August 2000 for the Clark Building.  (Ex. 101, p. 3, ¶ 9).

33.     On June 26, 2001, the plaintiff e-mailed Appleton and informed her she had given her April and May corrected copies for the Energy Consumption Reports, that were part of the entire package she gave her from July 1, 2000 to May 2, 2001.  She stated that she was making a copy of the April and May reports and that she recently gave her the June report (from May 2 though June 5, 2001).  (Ex. 101, p. 3, ¶ 10).

34.     At her deposition in 2002, Richardson still was unable to calculate the Energy Consumption report properly.  (Ex. 109, pp. 51:18-69:5).

35.     In the meantime, to ensure impartiality, CHRO Executive Director Cynthia Watts Elder hired personnel consultant Herbertia Williams (a black female) to investigate the plaintiff's behavior and work performance at CHRO.  (Ex. 101, p. 4, ¶ 11; Ex. 105, ¶¶ 22-24).

36.     In July 2001, Appleton discovered the plaintiff had processed 52 untimely deposits.  (Exs. 101, p. 4, ¶ 12; 105, ¶ 26) and on July 2, 2001, the plaintiff was counseled about her use of sick time (Ex. 33, p. 2).

37.     On July 5, 2001, Appleton informed the plaintiff in writing that, in light of the most recent review of a deposit slip, she was instituting procedures: "All original deposit slips must be provided to the business manager the day they are entered into SAAS; the business manager will review and maintain all original CO-96s; all bank deposit slips will be maintained in the safe, not locked in the file cabinet located in your cubicle. This ensures that in the event of your absence the deposits may continue to be done. As instructed in my e-mail dated July 3, 2001, I required an explanation of any deposit slip that does not confirm to the comptroller guidelines (24 hours over $500 and seven calendar days under) by close of business today. Failure to provide this information or to follow these procedures may result in disciplinary action up to and including dismissal from state service." (Ex. 101, p. 4, ¶13; Ex. 105, ¶ 27).

38.     The plaintiff filed another grievance on July 5, 2001, again accusing Appleton of being abusive, arbitrary, and discriminatory, citing "Written interrogation without just cause." (Ex. 101, p. 4, ¶ 14).

39.     On July 6, 2001, investigator Williams hand delivered a letter to the plaintiff requesting her to meet on Thursday, July 12, 2001. Her letter stated, "In the past, when I attempted to meet with you to discuss incidents and information I have received, you have declined my offer to meet. I am now at the final stages of reviewing the information I have received (i.e., statement from staff, e-mails, and memoranda) and I would like to meet with you before I complete my report. Currently, I am available to meet with you (and your Union Representative) on Thursday, July 12, 2001 between 7:00 a.m. at CHRO. If you decline my offer to meet, please understand that I will complete my recommendation devoid of your input." (Ex. 101, p. 4, ¶ 15).

40.     The plaintiff was interviewed by Williams concerning her working conduct.  The plaintiff defended herself against complaints of outbursts and inappropriate tone of e-mails, that she was frustrated by the e-mails sent by Appleton and that she did not set the tone, but responded to Appleton's e-mails.  (Ex. 101, p. 4, ¶ 16; Ex. 105, ¶ 25).

41.     The grievance was denied at step two of the grievance procedure on July 19, 2001, because no information or documentation was provided to support the grievance allegations.  (Ex. 101, p. 4, ¶ 17).

42.     On July 17, 2001, Appleton issued the plaintiff another written warning for violating a directive to provide an explanation for 52 untimely deposits and failure to follow comptroller guidelines as directed.  Appleton stated as of July 11, 2001, she had not received an acceptable explanation of why these deposits were not made in accordance with the comptroller's guidelines and told the plaintiff she was to provide her with that explanation.  (Ex. 45; Ex. 101, p. 4, ¶ 32; Ex. 105, ¶ 28).

43.     The plaintiff did not want to accept or sign the warning, and her union steward signed it for her.  On July 19, 2001, the plaintiff e-mailed Appleton, stating the report was done correctly and to provide her union representative with her corrections so he could have a record of the corrections, and then they could compare the reports.  The plaintiff accused Appleton of making a false accusation, retaliation and "harassment with proof."  (Ex. 101, p. 5, ¶ 19).

44.     On July 20, 2001, plaintiff was placed by Cynthia Watts Elder on paid administrative leave pending the investigation of charges of insubordination under Section 5-240-1a(c)12 of the Regulations of the Connecticut State Agencies ("RCSA"); offensive or abusive conduct toward co-workers, and misuse of state property and

equipment in violation of RCSA Sections 5-240 1a(c) 4 and 7, respectively, (Ex. 34), and on August 3, 2001, Watts Elder sent a letter to plaintiff suspending her without pay for ten (10) days from August 6, 2001 until August 20, 2001 for "offensive and abusive conduct towards co-workers, theft, misuse of state funds, property or equipment," "deliberate violation" of law, regulations and/or agency rules, and "insubordination." (Ex. 25, pp. 1 and 2).  Affidavits from all of the plaintiffs co-workers (5 of whom were black – Gulpi, Middleton, Davis, Walton and Spann) supported Watts Elders' decision, (Exhibits 18-21, 24-27; Ex. 109, pp. 108-111).

45.     The plaintiff filed her CHRO complaint #0210043 against her employer CHRO dated July 30, 2001, (Ex. 13) which she subsequently amended on October 3, 2001 (Ex. 14) and again on October 25, 2001 (Ex. 15).  Plaintiff filed her EEOC complaint against CHRO on September 6, 2001 (Ex. 16).

46.     Richardson believes that other black (not white) CHRO employees, James Davis, Lummie Span and Cheryl Gunn were treated better than her by Leanne Appleton. (Ex. 109, pp. 136:1-9, 150:21-25).

47.     In late July or early August 2001, investigator Herbertia Williams reported back to Cynthia Watts Elder that the investigation revealed no harassment or discrimination against Richardson. Further, that Richardson had been insubordinate, abusive towards her supervisor and staff, and had misused state property. (Ex. 51, pp. 1-2).

48.     In response to Richardson's July 30, 2001 CHRO complaint that she was being discriminated against by Leanne Appleton, the agency investigated her complaint.

It interviewed and obtained sworn affidavits from CHRO employees who all discredited Richardson's allegations. (Exhibits 18, 19, 20, and 21).

49.    In an e-mail on August 21, 2001, Appleton requested that the June reconciliation be completed with a correction document and an explanation of the corrections, and to place the information in her office by noon on August 24, 2001. (Ex. 101, p. 5, ¶ 21; Ex. 105, ¶ 33).

50.    The plaintiff submitted reconciliation on August 23, 2001, but did not provide details explaining why corrections were needed. Appleton e-mailed the plaintiff and told her to provide details she requested. (Ex. 101, p. 5, ¶ 22; Ex. 105, ¶ 34).

51.    Later on August 24, 2001, personnel officer Susan Carlson asked the plaintiff if she provided Appleton with the information asked for on the specific forms she required, and the plaintiff responded she had and she was not refusing any direct order. (Ex. 101, p. 5, ¶ 23).

52.    On August 28, 2001, Zakrzewski and Appleton acknowledged that a meeting would be scheduled between the parties. Appleton had proposed September 4, 2001, at any time, or September 5, 2001, in the morning. (Ex. 101, p. 5, ¶ 24).

53.    Appleton warned the plaintiff in writing in a memorandum dated August 28, 2001, and delivered by hand and e-mail on August 30, 2001. She warned her about failing to submit the reconciliation and explanation on time, and for continuously failing to provide her with information that was not in compliance with Appleton's directive; for failing to provide requested and required detailed explanations of her monthly reconciliation; refusing to accept the correct process for filing Energy Consumption

reports; and refusing to change her method of calculation in accordance with Appleton's requirement.  (Ex. 44; Ex. 101, p. 5, ¶ 25; Ex. 105, ¶ 35).

54.    Appleton had again checked with the program manager, Gerald D. Demeusy, who had confirmed that the corrected reports submitted prior to June 30, 2000 were correct.  She informed him that she had instructed the staff member who had been processing the reports to following that same method.  (Ex. 101, p. 5, ¶ 26).

55.    On September 14, 2001, Appleton e-mailed the plaintiff and instructed her to prepare the August Energy Consumption Report by Monday, September 17, 2001 for her review and signature.  (Ex. 101, p. 5, ¶ 27; Ex. 105, ¶ 36).

56.    On September 19, 2001, the plaintiff filed another grievance, accusing Appleton and CHRO staff of continuing "a pattern of lies, misrepresentations, ostracism, accusations . . . ," and placing a written warning in her personnel file without regard to the plaintiff's contract rights and for singling her out in an arbitrary manner.  (Ex. 101, p. 6, ¶ 28; Ex. 105, ¶ 37).

57.    On September 24, 2001, Appleton and personnel officer Susan Carlson went to the plaintiff's cubicle and told the plaintiff she was giving her a direct order to provide her with the corrected information based on the formula she gave her in June 2001, and to stop using the plaintiff's formula for calculation.  (Ex. 101, p. 6, ¶ 29; Ex. 105, ¶ 38).

58.    The plaintiff became angry and loud and told her she was right and Appleton was wrong.  (Ex. 101, p. 6, ¶ 30; Ex. 105, ¶ 39).

59.     Carlson and Appleton spoke to the Labor Relations office, and were instructed that if the plaintiff did not comply with Appleton's instructions, to give the plaintiff a "last chance" order.  (Ex. 101, p. 6, ¶ 31).

60.     The plaintiff e-mailed Appleton again, asking her why she did not provide her with a corrected report and give it to her, and accusing her of never giving her the calculation on how she came up with the dollar amount for the energy report.  The plaintiff accused Appleton of harassment and making false accusations about her work. (Ex. 101, p. 6, ¶ 32).

61.     The plaintiff again gave Appleton a report with the wrong formula.  (Ex. 101, p. 6, ¶ 33).

62.     On September 25, 2001, Carlson and Appleton again went to plaintiff's cubicle to give her the direct order to complete the report.  Appleton had the August report in hand for the plaintiff to correct.  (Ex. 101, p. 6, ¶ 34; Ex. 105, ¶ 41).

63.     The plaintiff told them to go back to the office.  Appleton told her she needed to talk to her and to come to the office.  The plaintiff told her again to go back to the office and asked for her union steward to come and talk about it.  (Ex. 101, p. 6, ¶ 35).

64.     Appleton told her it was unnecessary to have her union steward attend because she was giving her an order and not disciplining her.  (Ex. 101, p. 6, ¶ 36).

65.     The plaintiff then became loud and upset, telling them she was not going to take it any more.  The managing director and commission attorney, Raymond Pech, was passing by and told them to let it go.  (Ex. 101, p. 6, ¶ 37; Ex. 105, ¶ 42).

66.     The plaintiff then rushed from the cubicle, alarming both Appleton and Carlson, who were both backing away from her, and left the area.  (Ex. 101, p. 6, ¶ 38).

67.    The plaintiff then called the police to report she had been assaulted.  (Ex. 101, p. 6, ¶ 39; Ex. 105, ¶ 43).

68.    The police informed the plaintiff (and the defendant CHRO) that they could not substantiate her version of events on September 25, 2001, that this was a labor management issue.  (Ex. 43, p. 12; Ex. 105, ¶ 44; Ex. 113, Affidavit of Donald Newton, dated June 4, 2004, ¶ 9).

69.    Donald Newton, the CHRO Director of Filed Operations, was assigned to investigate the September 25, 2001 incident involving Richardson and Appleton. (Ex. 113, ¶ 7).

70.    All of the witnesses to the incident of September 25, 2001 (McQuiggan, Pech, Middleton and Carlson) were interviewed by Newton. They supported Appleton's version of events and discredited the plaintiff's version. (Ex. 43, p. 12; Ex. 113, ¶ 8 ).

71.    On September 26, 2001, Executive Director Cynthia Watts Elder wrote a letter to the plaintiff that was hand-delivered to the plaintiff, informing her of a pre-disciplinary meeting schedule for October 10, 2001.  Watts Elder listed the charges, which were her refusal to comply with her supervisor's direct order to prepare the corrected energy consumption report for August 2001, using her supervisor's format, and raising her voice to the point that others overheard her and telling her supervisor she did not care if it was a direct order, she was not going to do anything wrong, and that the next day she again refused to follow the order, and leaving the work area.  (Ex. 48: Ex. 101, p. 7, ¶ 40; Ex. 105, ¶ 45).

72.    Finally after several warnings and at least one suspension, the plaintiff's continued behavior left Watts Elder no choice but to consider termination. After carefully

reviewing the facts, including the sworn affidavits of co-workers, Watts-Elder made the decision to terminate Richardson.  (Ex. 105, ¶ 46).

73.     In a letter dated October 15, 2001, the employer notified the plaintiff that the agency had concluded its investigations of her insubordination and offensive or abusive conduct toward coworkers and her supervisor, and decided to dismiss her effective October 29, 2001.  The letter specifically told the plaintiff the dismissal action was being taken pursuant to the A&R Collective Bargaining Agreement and Connecticut General Statute 5-240(c) for the "good of the service" of the CHRO, specifically, as a result of her insubordination and offensive conduct towards co-workers and supervisors. (Ex. 49; Ex. 101, p. 7, ¶ 41; Ex. 105, ¶ 47).

74.     The plaintiff grieved her termination and a step 3 hearing was held by the Office of Labor Relations on October 22, 2001 pursuant to the union contract.  The hearing officer was Donald Bardot. (Ex. 115, Affdiavit  of Leanne Appleton, dated June 4, 2004, ¶ 10).

75.     At the step 3 grievance hearing the plaintiff was represented by her union representatives, Warren Cullen and Joseph Zakrzewski. (Ex. 115, ¶ 11).

76.     The second day of the Step 3 grievance hearing was scheduled for November 7, 2001.  (Ex. 115, ¶ 10).

77.     During the November 7, 2001 Step 3 hearing, Donald Bardot learned that Richardson had amended her CHRO compliant to include a race discrimination claim regarding her termination. (Ex. 106, Excerpt from  deposition of Donald Bardot, dated December 2, 2002, pp. 79, 88, 90).

78.     At no time during the Step 3 grievance hearing did Donald Bardot promise or reach an agreement with the plaintiff to reinstate her into state service. (Ex. 106, pp. 77:19-25, 88:3-10; Ex. 107, Excerpt from deposition of Joseph Zakrzewski, dated September 27, 2002, pp. 110:4-16, 113:5-115-1; Exhibit 108, Excerpt from deposition of Warren Cullen, dated September 27, 2002, pp. 52:8-11, 90:16-23; Exhibit 115, Affidavit of Leanne Appleton, dated June 4, 2004, ¶ 10).

79.     The plaintiff admits that Donald Bardot told her during the Step 3 grievance that he had no authority to reinstate her into state service. (Ex. 110, Richardson Depo., pp. 246:18-247:3, 382:2-18).

80.     The union contract provides that in Article 15, sec. 10, that complaints of unlawful discrimination filed with the CHRO are not subject to arbitration under the contract's antidiscrimination clause.  (Ex. 86, pp. 31, 32).

81.     On November 9, 2001, Warren Cullen, who was Chief Steward of plaintiff's union (A&R Local 4200) wrote two letters to OPM Director of Labor Relations Linda Yelmini in which he stated "A&R hereby withdrawals our request for arbitration on the above referenced [plaintiff's] grievance."  (Exhibits 74 & 75).

82.     The union constitution and contract provided for the plaintiff to appeal the decision of Arbitration Review Panel denying her request for arbitration and she was so informed by the union, but chose not to pursue the matter. (Ex. 89, p. 11, ¶ 6b; Ex. 109, pp. 61-63).

83.     Soon after she was fired, the plaintiff applied for unemployment benefits, but defendant CHRO contested it on the grounds that she was fired for willful misconduct.  Hearings were held before Appeals Referee Lee Ellen Terry on December

31, 2001, January 29, 2002, and March 1, 2002, in which many witnesses (including

plaintiff, Appleton, Newton and others) testified under oath and were cross examined by

counsel.  The plaintiff was represented by her attorney, Jonathan Gould, Esq. (Exhibits

98, 99, 100, 101).

88.     The Labor Department Referee took sworn testimony of various witnesses

over several days  (256 pages of transcripts) and the parties had a full and fair opportunity

to litigate the issue of whether CHRO fired plaintiff for willful misconduct.  (Exhibits 98,

99 and 100).

85.     On April 30, 2002, Appeals Referee Terry issued a 9-page decision which

included 42 Findings of Fact and a carefully reasoned and well written conclusion that

CHRO had indeed fired plaintiff because of her willful misconduct.  (Ex. 101).

86.     On May 13, 2002, the plaintiff filed an appeal from Referee Terry's

decision, which included additional evidence and an 8-page brief full of arguments about

why the plaintiff felt that Referee Terry's decision was wrong on the facts and the law.

(Ex. 102).

87.     On November 19, 2002, the Board of Review issued a 6-page decision

which affirmed every aspect of Referee Terry's ruling, and concluded that plaintiff was

properly fired by CHRO for willful misconduct.  (Ex. 104).

88.     On July 19, 2001, an "anonymous" person filed a complaint with the

Connecticut Auditors of Public Accounts alleging that CHRO Business Manager Leanne

Appleton "had violated the State's accounting guidelines, as well as some statutory

provisions concerning allotments of state appropriations."  After a full investigation, the

Auditors concluded that Appleton had done nothing wrong, but that "a state employee

[obviously the plaintiff herein], who later was terminated for cause, had failed to properly maintain the CHRO appropriation records and to perform the monthly reconciliation between these records and the state's official accounting records . . . .  The Fiscal Administrative Manager [Appleton] appeared to have taken reasonable action when she became aware of the employee's [plaintiff's] performance problems.  (Ex. 96, p. 4).

89.     On February 7, 2002, the plaintiff filed a complaint with the Auditors of Public Accounts alleging that CHRO violated state law by hiring Herbertia Williams (black female) of T. Ball & Associates to investigate the plaintiff's allegations that Appleton harassed her and discriminated against her.   On June 17, 2002, the Auditors issued their report on the plaintiff's complaint to Attorney General Blumenthal which concluded that "our review could not substantiate the complaint's [plaintiff's] allegations."  (Ex. 97, p. 3).

90.     On March 15, 2002, the plaintiff's CHRO complaint #0210043 against CHRO (pertaining to her suspensions and termination) was dismissed on the grounds that "there is no reasonable possibility that further investigation will result in a finding of reasonable cause."  The report noted that the decision was based on affidavits from witnesses whom complainant (plaintiff herein) had claimed would support her position:

> Indeed, these affidavits were composed by persons who actually witnessed many of incidents in question and also serve to belie your version of these events, contrary to your allegations that the individuals in question would support your position.  These incidents – which you have characterized as constituting harassment and retaliation – are more likely to support respondent's [CHRO's] allegations that your conduct in the workplace was inappropriate and at times, insubordinate, this too, supported by the aforementioned documentation.  Moreover, a review of the e-mails and other correspondence issued to your supervisor provide unequivocal examples of your refusal to follow direct orders, despite numerous attempts on the part of the respondent [CHRO] to rectify these problems.

(Ex. 57, p. 2).

91.     The plaintiff never filed an appeal in Connecticut Superior Court from the decision to dismiss her CHRO Complaint #0210043, nor did she ever file a request for reconsideration, even though she was informed of her right to do so.  (See Ex. 57, p. 1).  As a result, CHRO issued a Right to Sue/Release of Jurisdiction notice to the plaintiff on April 10, 2002.  (Ex. 58).  However, the plaintiff never utilized said notice to file an action in Superior Court pursuant to Conn. Gen. Stat. § 46a-100 and 101, even though Exhibit 58 specifically notified her of her right to do so.  (Ex. 58).

92.     On April 9, 2002, the plaintiff filed a CHRO Complaint #0210423 (Exhibit 80) against her union (A&R Local 4200), alleging <u>inter</u> <u>alia</u>) that the union had retaliated against her in violation of Title VII by withdrawing her request for arbitration of her discrimination claims against CHRO.  In it Answer to the Complaint, the Union stated under oath in pertinent part that:  "The Respondent's [union's] Arbitration Review Board recommended that the Complainant's grievances [concerning her suspensions and termination by CHRO] not go to arbitration.  The Respondent [union] withdrew its grievances on behalf of the Complainant [plaintiff herein] . . . . "The Complainant had the opportunity to appeal the decision of the Arbitration Review Board to the Respondent's Representative Assembly which is the governing body of the Respondent Union.  The Complainant was informed of this right by Chief Steward Warren Cullen.  The Complainant did not appeal the decision of the Arbitration Review Board to the Representative Assembly."  (Ex. 84, p. 5, ¶ 40).  In the defendant A&R Union's Answer, (Exhibit 112, ¶ 78)(last sentence), this federal complaint, it states that:  "In addition, the Collective Bargaining Agreement allows an individual to pursue the grievance to

arbitration."  The plaintiff did not pursue her grievances to arbitration.  Also in its

Answer to the federal complaint in this case, the defendant Union raised exhaustion as an

Affirmative Defense. (Ex. 112,  ¶ 78).

     93.    On September 4, 2002, the CHRO dismissed the plaintiff's complaint

#0210423 against the Union on the grounds that "there is no reasonably possibility that

further investigation could result in a finding of reasonably cause . . . "  because "the

review of the entire file is likely to show that respondent [union] did not retaliate against

you.  Instead, the review shows that Respondent's actions were in accordance with the

Union Contract . . . "  (Ex. 93, p. 1).  This decision also gives the plaintiff written notice

that she had the right to request reconsideration, and that if she did, she would

automatically "be issued a release of jurisdiction which grants you the right to file a civil

action in Superior Court."  (Ex. 93, p. 2).  The plaintiff decided to file a request for

reconsideration on September 12, 2002 (Ex. 94).  That request is still pending before

CHRO.  (Ex. 113, ¶ 5-6).

     94.    On April 9, 2002, the plaintiff filed a CHRO complaint #0210422 against

OPM, alleging inter alia that by executing a collective bargaining agreement with the

A&R Union (which provided that her discrimination complaints were not arbitrable if she

also filed a CHRO complaint), that "OPM and the union have discriminated against me"

in that said CBA provision constituted illegal retaliation in violation of Title VII and

various CFEPA state law provisions.  (Ex. 59, p. 7, ¶ 40).  In this complaint in paragraphs

30-35, the plaintiff also alleged that defendant Bardot had promised her another state job

shortly after she was fire by CHRO, but that he reneged on his promise under pressure

from his boss, defendant Yelmini.  (Ex. 59, pp. 5-6, ¶¶ 30-35).  OPM filed an Answer to

this complaint on June 14, 2002 in which it denied all of the plaintiff's allegation and attached affidavits from both Bardot and Yelmini.  (Exhibits 62, 63 and 64).

95.     On September 4, 2002, the CHRO dismissed the plaintiff's complaint #0210422 against OPM on the grounds that "there is no reasonable possibility that further investigation could result in a finding of reasonable cause" because "the Respondent's actions were in accordance with the union contract."  (Ex. 77, p. 1).  This decision also gave plaintiff written notice that she had the right to request reconsideration, and that if she did, she would automatically "be issued a release of jurisdiction which grants you the right to file a  civil action in Superior Court. "  (Ex. 77, p. 2).  The plaintiff decided to file a request for reconsideration on September 12, 2002 (Ex. 78).  That request is still pending before CHRO at this time. (Ex. 113, ¶ 5-6).

96.     Richardson's response to criticism while employed  at the CHRO was to blame others, to declare that she was not wrong,  or accuse other of  being out to get her and discriminate against her. (Ex. 105, ¶ 48).

97.     According to Watts Elder, the CHRO staff showed great restraint and patience in dealing with Richardson. They were always trying to help Richardson do her job correctly to the point of overlooking her constant insubordination until it reached the point that it was having a detrimental effect on the business office. (Ex. 105, ¶ 49).

98.     All of the personnel decisions implemented by Leanne Appleton were done at the direction of Cynthia Watts Elder after consultation. (Ex. 105,  ¶ 49; Ex. 115, ¶ 6).

99.     The plaintiff filed her lawsuit on April 18, 2000.  (Complaint).

100.    Richardson has no evidence of any conversation betweens between Appleton and OPM showing a conspiracy.  (Ex. 109, p. 145:2-23).

101.    Plaintiff's union, A&R, withdrew its request to arbitrate issues regarding the plaintiff's suspension and termination after she amended her CHRO complaint to include those two issues. (Ex. 112,  ¶ 44).


DEFENDANTS,

RICHARD BLUMENTHAL
ATTORNEY GENERAL

BY:    _____
Joseph A. Jordano
Assistant Attorney General
Federal Bar # ct21487
55 Elm Street, P.O. Box 120
Hartford, CT 06141-0120
Tel: (860) 808-5340
Fax: (860) 808-5383
E-mail: Joseph.Jordano@po.state.ct.us

## **CERTIFICATION**

The undersign does hereby certify that on this 7th day of June 2004,a true and accurate copy of the foregoing was sent by first class United States mail, postage prepaid, to:

      Royce Vehslage
      Genovese, Vehslage & LaRosa
      500 Enterprise Drive
      Rocky Hill, CT 06067

      Brian Doyle
      Ferguson & Doyle
      35 Marshall Road
      Rocky Hill, CT 06067

and hand delivered on June 8, 2004 to:

      Cynthia Jennings
      Barrister Law Group
      211 State Street
      Bridgeport, CT 06604

                              _____
                              Joseph A. Jordano
                              Assistant Attorney General