FILED

2004 SEP 27 P 4: 00

U.S. DISTRICT COURT
HARTFORD, CT.

## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

LEONYER RICHARDSON          :        CV: NO:3:02CV0625 (AVC)
    *Plaintiff,*          :
v.          :
              :
STATE OF CONNECTICUT          :
COMMISSION ON HUMAN          :
RIGHTS AND OPPORTUNITIES,:
OFFICE OF POLICY AND          :
MANAGEMENT, CFEPE-AFT,  :
AFL-CIO, ET AL..          :        SEPTEMBER 27, 2004
    *Defendants.*

## PLAINTIFF'S MEMORANDUM  IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I.     INTRODUCTION

The plaintiff has suffered a great indignity at the hands of the defendants.  The

defendants' description of the plaintiff's complaint as "frivolous" in the introduction is

telling.  The lack of respect and recognition for exercising one's rights for violation of

state and federal laws is further indication of the disdain and disregard the defendants had

for the plaintiff.  The fact that such disdain and disregard is also the foundation of a

retaliation claim only further merits the plaintiff's contentions.

## II.    FACTS

The defendants recitation of the facts is not only improper, but without merit. Instead of stating facts, the defendants attempt to rely on documents, likely inadmissible at trial, that state standard template language not reflective of the facts in the case at hand.

The plaintiff, Leonyer Richardson, is an African American woman with dark skin color. Until her termination in October of 2001, the plaintiff had been an employee in the classified service of the State of Connecticut since May 1986. The plaintiff started in the Department of Environmental Protection first as a Clerk Typist. She earned several promotions up to the position of Fiscal Administrative Officer. In 1997, the plaintiff voluntarily transferred to the Office of Policy and Management (OPM) as a Fiscal Administrative Officer. After the plaintiff received the transfer, she began to experience racial discrimination from her white supervisors, Mary Ann Palmorozza an delaine Shew that adversely affected the terms and conditions of her employment. After discovering that the plaintiff had filed complaints of discrimination with the Equal Employment Opportunities Commission (EEOC) and the Commission on Human Rights and Opportunities (CHRO), these supervisors retaliated against Ms. Richardson by suspending her from her job without cause. In order to resolve those complaints, OPM and the plaintiff agreed to transfer Ms. Richardson to a job as Fiscal Administrative

Officer at CHRO. Before commencing her job at CHRO, the plaintiff had a discussion

with the defendant, Leanne Appleton. Appleton was assigned as the plaintiff's supervisor

at CHRO. In that discussion, defendant Appleton indicated that it was not her choice to

hire the plaintiff. At the time defendant Appleton wanted to hire other candidates that she

was interviewing for the position. The plaintiff discovered that these candidates were not

African American and that they did not have pending complaints of discrimination

against the State. After the plaintiff's transfer, she also discovered that OPM continued

to classify her as one of its employees and that many of the terms and conditions of her

employment were still controlled by OPM. Neither OPM nor CHRO informed the

plaintiff of this decision at the time of her transfer. Because OPM still controlled many

of the terms and conditions of the plaintiff's employment, defendant Appleton was in

frequent contact with OPM managers, including Mary Ann Palmorozza, the chief

administrator for the OPM business office about the plaintiff. Thus defendant Appleton

had several conversations with Palmorozza and others at OPM regarding the plaintiff and

her previous complaints.

Soon after the plaintiff's placement at CHRO, defendant Appleton began a

campaign to discredit the plaintiff's work and treat her differently from the way

defendant Appleton treated other similarly situated white employees who had not

complained of discrimination.  In February, April and July of 2001, based on defendant

Appleton's discriminatory and retaliatory animus and on conversations with OPM's

managers, Appleton also took adverse employment actions against the plaintiff by issuing

her written warnings for alleged reasons that were false and pretextual.  As part of this

campaign to discredit the plaintiff defendant Appleton and defendant Watts-Elder hired a

private investigator to investigate the plaintiff.   It was later discovered that this

investigator did not hold a State license.  The plaintiff complained that these adverse

actions were discriminatory and retaliatory both in the CHRO complaint she filed on July

30, 2001 and the union grievances she filed.  After receiving notice of these complaints,

defendant Appleton, with the approval of defendant Watts-Elder, suspended the plaintiff

without pay on August 6, 2001.

Defendant Appleton then provided the plaintiff with an unsatisfactory

performance evaluation on September 19, 2001.  After the unsatisfactory performance

evaluation, defendant Appleton agreed to attend periodic meetings with the plaintiff and

her union representative in an attempt to mediate the disputes regarding the plaintiff's

alleged performance problems.  The first meeting was scheduled for September 27, 2001.

On September 25, 2001, defendant Appleton ordered the plaintiff to meet with her

immediately regarding issues for which defendant Appleton had previously disciplined

the plaintiff. The issues raised were the same issues defendant Appleton had previously

agreed were to be discussed at the September 27 meeting with the plaintiff and her union

representative. The plaintiff informed defendant Appleton that before she met, she

needed to ensure that her union representative could be in attendance as previously

agreed and as guaranteed in the union's collective-bargaining agreement with the State.

The plaintiff called her union representative in the presence of defendant Appleton. The

plaintiff informed defendant Appleton that the union representative was on state business

related to his job, but that he could meet with defendant Appleton and the plaintiff later

that day. Despite the same, defendant Appleton insisted that the plaintiff meet with her

immediately without the union representative. Defendant Appleton began shouting at the

plaintiff and also blocked the exit to the plaintiff's office in a manner that was physically

threatening to the plaintiff. Later that day, on information provided by Appleton,

defendant Watts-Elder suspended the plaintiff for allegedly violating direct orders from

defendant Appleton. The reason was false and pretextual because the plaintiff had never

violated any such orders. On October 16, 2001, Watts-Elder terminated the plaintiff's

employment for the same false and pretextual reasons.

    After her warnings, suspensions, unsatisfactory evaluation and termination, the

plaintiff filed grievances against the state under Article 15 of the union's collective

5

bargaining agreement. This agreement prevented the plaintiff's termination without just cause and gave her a property right to continued employment with the State. On October 22, 2001, the plaintiff attended a third step hearing regarding those grievances with her union representative. The defendant Bardot presided over that third step meeting. At the meeting, Bardot agreed to reinstate the plaintiff's employment with the State and agreed to transfer the plaintiff from CHRO to a different State agency. During that meeting, Bardot also informed Ms. Richardson that he thought that defendant Appleton was a bigot.

On or about October 27, 2001, at a subsequent meeting, Bardot informed the plaintiff that he had discovered that Ms. Richardson had filed and amended CHRO and EEOC complaints on July 30, 2001, October 3, 2001, and October 25, 2001 to include adverse employment actions that were part of the grievances before him and that would be subject to arbitration under the union contract. Bardot also informed the plaintiff that because she had filed these complaints of discrimination and retaliation, on instructions from his supervisor, defendant Yelmini, he was denying the grievances and refusing to reinstate her employment with the State.

After defendant Bardot rescinded his agreement to reinstate Ms. Richardson, she requested that the union appeal her grievances to arbitration under Article 15, Section 6

of the union contract. The union representative, Warren Cullen, informed Ms.

Richardson that the union was withdrawing its appeal of her grievances to arbitration

because she had amended her CHRO and EEOC complaints to include adverse

employment actions that would be subject to the arbitration. Cullen also informed the

plaintiff that because she had amended her CHRO and EEOC complaints to include

adverse employment actions that would be subject to the arbitration, Bardot and OPM

had informed the union that they would challenge the arbitrability of those grievances

under Article 15, section 10(a)(2) of the union contract with the State. This section of the

union contract allegedly prohibits arbitration of grievances where the subject matters of

the grievances are also the subject matters of a CHRO and/or EEOC complaint. Cullen

also informed the plaintiff that the union believed that because the plaintiff had amended

her CHRO and EEOC complaints, her grievances were not arbitrable under Article 15,

section 10(a)(2) of the union contract.

### III. STANDARD

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings,

depositions, answers to interrogatories, and admissions file, together with the affidavits,

if any, show that there is no genuine issue as to any material fact that the moving party is

entitled to a judgment as a matter of law." The Court must draw all reasonable inferences

in the light most favorable to the party opposing the motion, <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,</u> 475 U.S. 574, 587 (1986), mindful that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." <u>Anderson v. Liberty Lobby, Inc.,</u> 477 U.S. 242, 255 (1986)

To raise a genuine issue of material fact sufficient to defeat a summary judgment motion, the opponent need not match, item for item, each piece of evidence proffered by the moving party. So long as the opponent has offered enough evidence to exceed the "mere scintilla" threshold, summary judgment is to be denied. <u>In re Unisys Savings Plan Litigation,</u> supra, 74 F.3d 420, 433.

Even if the nonmoving party's evidence appears "implausible," the court may not "weigh" the evidence and must proceed with the greatest caution. R. B. Ventures, Ltd. v. Shane, 112 F.3d 54, 58-59 (2d Cir. 1997). "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the non moving party.' <u>Anderson v. Liberty Lobby, Inc.,</u> 477 U.S. 242, 248 (1986). Thus, '[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.'" Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531,

1535 (2d Cir. 1997).  Citing Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir.

1996).

IV.       **ARGUMENT**

**THE PLAINTIFF CAN PROVE RACE DISCRIMINATION
UNDER TITLE VII AGAINST CHRO**

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) lays out the burden of

production and order of proof analysis for Title VII causes of action and 42 U.S.C. §

1981 causes of action.  "To make out a prima facie case, the plaintiff must show that:  (i)

she is a member of a protected class; (ii) she was qualified for the position; (iii) the

defendant took adverse action against her; and (iv) the adverse action occurred under

circumstances giving rise to an inference of discrimination."  Harper v. Metropolitan

District Commission, 134 F. Supp. 2d 479, 483 (D. Conn. 2001) (Covello, C.J.).  Stated

another way, a plaintiff may make out a prima facie case "by showing that she is within a

protected group; that she is qualified for the position; that she was subject to an adverse

employment action...; and that a similarly situated employee not in the relevant protected

group received better treatment." McGuinness v. Lincoln Hall, 263 F.3d 49, 53 (2d Cir.

2001).  "Alternatively, the fourth prong of the prima facie case may be satisfied if the

plaintiff can demonstrate that the...adverse employment action occurred under

circumstances giving rise to an inference of discrimination on the basis of plaintiff's

9

membership in that class." Farias v. Instructional Systems, Inc., 259 F.3d 91, 98 (2d Cir. 2001).

"To establish a prima facie case of disparate treatment, a plaintiff must show, inter alia, that she was subjected to adverse employment action, under circumstances giving rise to an inference of prohibited discrimination." Fitzgerald v. Henderson, 251 F.3d 345, 356 (2d Cir. 2001). "In an employment discrimination case, the plaintiff has the burden of 'proving by the preponderance of the evidence a prima facie case of discrimination.'" Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994), quoting Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). A plaintiff need not necessarily prove a prima facie case to prevail, however. "For instance, if a plaintiff is able to produce direct evidence of discrimination, he may prevail without proving all the elements of a prima facie case." Swierkiewicz v. Sorema N.A., 122 S. Ct. 992, 997 (2002).

Despite defendants' parenthetical comment that the plaintiff has not established a prima facie case of discrimination, the plaintiff has more than established the same. Had the plaintiff not established even a prima facie case, the defendants would have been successful in a motion to dismiss. The defendants concede that the plaintiff is a member of a protected class and that she was subjected to an adverse employment action.

Defendants choose to focus on the third prong contending that the plaintiff cannot show that she was doing her job satisfactorily or that she was fired under circumstances giving rise to an inference of discrimination. The plaintiff's numerous "good" and "very good" performance evaluations earned over the course of her many years of employment are evidence that she knew her job and had been performing satisfactorily until she began to encounter the discriminatory environment. (Exhibit 2, plaintiff's performance evaluations) Furthermore there is ample evidence to demonstrate that the plaintiff was terminated under circumstances giving rise to an inference of discrimination. The reasons given for discrimination: poor work performance, insubordination and workplace violence are all pretextual. Plaintiff is aware of other similarly situated employees, namely, Kathy Stone, who were accused of the same work misgivings as the plaintiff and was not even disciplined. (exhibit 42) The lack of a workplace violence incident is overwhelming. Even the recently Acting Executive Director, Raymond Pech, who was a witness to the alleged incident, gave testimony at a Department of Labor hearing that the plaintiff exited her cubicle and went to an empty space. (exhibit 65) In the case at hand, a reasonable jury may infer discrimination from the evidence and the circumstances of the plaintiff's termination.

"[S]ummary judgment...is particularly inappropriate where the inferences which the parties seek to have drawn deal with questions of motive, intent, and subjective feelings and reactions." Suarez v. Dickmont Plastics Corp., 229 Conn. 99, 111, 639 A.2d 507 (1994). "A question of intent raises an issue of material fact, which cannot be decided on a motion for summary judgment." Picataggio v. Romeo, 36 Conn. App. 791, 794, 654 A.2d 382 (1995). When passing upon a motion for summary judgment, the court may not resolve factual disputes or make credibility determinations, even if the case is one which eventually will be tried without a jury. In re Unisys Savings Plan Litigation, 74 F.3d 420 (3d Cir. 1996). Rather, the court must resolve any ambiguities and draw all inferences against the moving party. Appleton v. Board of Education, 254 Conn. 205, 757 A.2d 1059 (2000); Cargill, Inc. v. Charles Kowsky Resources, Inc., 949 F.2d 51 (2d Cir. 1991). The evidence of the party against whom summary judgment is sought must be believed. Revak v. SEC Realty Corp., 18 F.3d 81 (2d Cir. 1994). The court must construe the evidence in the light most favorable to the party opposing summary judgment and deny the motion unless no construction of the evidence could support judgment in the plaintiff's favor. Appleton, supra; Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970); Olin Corp. v. Consolidated Aluminum Corp., 5 F.3d 10, 14 (2d Cir. 1993); United States v. Certain Funds on Deposit in Scudder Tax Free Investment

Account #2505103, 998 F.2d 129 (2d Cir. 1993); Union Pacific Corp. v. United States, 5

F.3d 523, 525 (Fed. Cir. 1993); Suarez v. Dickmont Plastics Corp., 229 Conn. 99, 105

(1994); D.H.R. Construction Co. v. Donnelly, 180 Conn. 430, 434 (1980); Connell v.

Colwell, 214 Conn. 242, 246-47 (1990).

The defendants would also have the Court believe that a Merit Assessment

Review conducted by an administrative agency is controlling. Such an action would

override the well established procedures already in place whereby a plaintiff may request

a release of jurisdiction and right to sue from the various agencies. Even if "substantial

weight" is given to the CHRO Merit Assessment Review, there was no investigation

conducted, no witnesses gave testimony and it is the right of the plaintiff to file an action

in federal or state Court even if a case is merit assessed out of the agency.

The defendants' second claim to avoid liability is equally without merit. The

defendants' contention that the plaintiff is "relitigating" her Title VII claim in her §1983

claim is frivolous. The plaintiff has not "litigated" her Title VII claim in the first place as

previously stated.

In University of Tennessee v. Elliott, 478 U.S. 788, 796 (1986), the Supreme Court

held that "Congress did not intend unreviewed state administrative proceedings to have

preclusive effect on Title VII claims." In Elliot, the plaintiff had filed a federal complaint

while state administrative proceedings were pending. The administrative hearing was held during the pendency of the federal lawsuit, in which the administrative judge ruled against the plaintiff. The plaintiff then sought to pursue his federal claims, and the district court held that the administrative findings should be given preclusive effect. The Sixth Circuit reversed, and the Supreme Court affirmed the Sixth Circuit decision. In so holding, the Supreme Court considered the language of Title VII requiring the EEOC to give "'substantial weight to final findings and orders made by State or local authorities in proceedings commenced under State or local [employment discrimination] law,'" id. at 794 (quoting 42 U.S.C. § 2000e-5(b)), and noted that "it would make little sense for Congress to write such a provision if state agency findings were entitled to preclusive effect in Title VII actions in federal court." Id.

### PLAINTIFF IS NOT COLLATERALLLLY ESTOPPED FROM LITIGATING THE ISSUE OF HER UNSATISFACTORY PERFORMANCE

Collateral estoppel, or issue preclusion, is that aspect of res judicata which prohibits the relitigation of an issue when that issue was actually litigated and necessarily determined in a prior action between the same parties upon a different claim.

In the case at hand, the plaintiff's unsatisfactory job performance issue was evaluated under the unemployment laws. (see defendants' exhibits 102-104) The Labor Referee did not determine whether or not there was discrimination. The Labor Referee

did not compare the plaintiff's performance with those similarly situated. The Labor

Referee determined the plaintiff's eligibility to receive unemployment compensation.

### PLAINTIFF CAN ESTABLISH A PRIMA FACIE CASE OF RETALIATION

Title VII provides that it is an "unlawful employment practice for an employer to

discriminate against any of his employees . . . because he has opposed any practice made

an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). In order to

establish a prima facie case of retaliation, plaintiff must show (1) that he engaged in a

protected activity; (2) that he suffered an adverse employment action subsequent thereto;

and (3) that a causal connection exists between his participation in the protected activity

and the adverse employment action. Gallagher v. Delaney, 139 F.3d 338, 349 (2d

Cir.1998)

The causal connection between the protected activity and the adverse employment

action can be established indirectly with circumstantial evidence, for example, by

showing that the protected activity was followed by discriminatory treatment or through

evidence of disparate treatment of employees who engaged in similar conduct or directly

through evidence of retaliatory animus. DeCintio v. Westchester County Medical Center,

821 F.2d 111, 115 (2d Cir.), cert. denied 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395

(1987); Grant v. Bethlehem Steel, 622 F.2d 43, 46 (2d Cir. 1980). Title VII is violated if

a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause, Davis v. State University of New York, 802 F.2d 638, 642 (2d Cir. 1986), and if the employer was motivated by retaliatory animus. Title VII is violated even if there were objectively valid grounds for the discharge. DeCintio, 821 F.2d at 116, n. 8.

The defendants attempt to limit the time period of complainant's complaints to the time period after July 30, 2001. However as the defendants themselves concede, the plaintiff began complaining about discrimination well before July 30, 2001. A claim for retaliation is NOT limited to the filing of a formal complaint with an administrative agency. The plaintiff was employed by the State for just over fifteen (15) years. She did not suffer the many adverse employment actions until she encountered the racist environment and was retaliated against for complaining about the same.

Even the rash of discipline the plaintiff suffered AFTER the July 30, 2001 filing of a CHRO complaint is indicative of retaliation. After receiving notice of the complaint, defendant Appleton, with the approval of defendant Watts-Elder, suspended the plaintiff without pay on August 6, 2001. Defendant Appleton then provided the plaintiff with an unsatisfactory performance evaluation on September 19, 2001. After the unsatisfactory performance evaluation, defendant Appleton agreed to attend periodic meetings with the plaintiff and her union representative in an attempt to mediate the disputes regarding the

plaintiff's alleged performance problems. The first meeting was scheduled for September

27, 2001. On September 25, 2001, defendant Appleton ordered the plaintiff to meet with

her immediately regarding issues for which defendant Appleton had previously

disciplined the plaintiff. The issues raised were the same issues defendant Appleton had

previously agreed were to be discussed at the September 27 meeting with the plaintiff and

her union representative. The plaintiff informed defendant Appleton that before she met,

she needed to ensure that her union representative could be in attendance as previously

agreed and as guaranteed in the union's collective-bargaining agreement with the State.

The plaintiff called her union representative in the presence of defendant Appleton. The

plaintiff informed defendant Appleton that the union representative was on state business

related to his job, but that he could meet with defendant Appleton and the plaintiff later

that day. Despite the same, defendant Appleton insisted that the plaintiff meet with her

immediately without the union representative. Defendant Appleton began shouting at the

plaintiff and also blocked the exit to the plaintiff's office in a manner that was physically

threatening to the plaintiff. Later that day, on information provided by Appleton,

defendant Watts-Elder suspended the plaintiff for allegedly violating direct orders from

defendant Appleton. The reason was false and pretextual because the plaintiff had never

violated any such orders. On October 16, 2001, Watts-Elder terminated the plaintiff's