employment for the same false and pretextual reasons.   There is ample evidence to

support a claim of retaliation.

   "The plaintiff's burden of establishing a prima facie case of employment

discrimination is 'not onerous.' Burdine, 450 U.S. at 253.  Indeed, "[t]he nature of the

plaintiff's burden of proof is de minimis." Harper v. Metropolitan District Commission,

134 F. Supp. 2d 470, 483 (D. Conn. 2001) (Covello, C.J.), citing Dister v. Continental

Group, Inc., 859 F.2d 1108, 1114 (2d Cir. 1988).  "As we have often emphasized, the

burden of establishing this prima facie case in employment discrimination cases is

'minimal.'" McGuinness v. Lincoln Hall, 263 F.3d 49, 53 (2d Cir. 2001).  Direct

evidence is not necessary, and a plaintiff charging discrimination against an employer is

usually constrained to rely on the cumulative weight of circumstantial evidence.  See

Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir. 1991) ('An employer who discriminates

is unlikely to leave a 'smoking gun,' such as a notation in an employee's personnel file,

attesting to a discriminatory intent.')." Luciano v. Olsten Corp., 110 F.3d 210, 215 (2d

Cir. 1997).  Often, "[w]hat is most revealing of the true intention behind the [adverse

employment action] is the timing." Harper v. Metropolitan District Commission, 134 F.

Supp. 2d 470, 489 (D. Conn. 2001) (Covello, C.J.).

18

The employer may seek to rebut the prima facie case by proof of a legitimate nondiscriminatory reason for the adverse employment action.  If the plaintiff is able to persuade the jury that the employer's explanation is false, however, that fact, combined with the prima facie case, is sufficient to permit a jury to find intentional discrimination. "Proof that the defendant's explanation is unworthy of credence is...one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive....In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.  Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'"  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S. Ct. 2097, 108 (2000), quoting Wright v. West, 505 U.S. 277, 296 (1992). "The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.  Thus, rejection of the defendant's proferred reasons will permit...the trier of fact to infer the ultimate fact of intentional discrimination...[and] no additional proof of discrimination is required."  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511 (1993).  "[O]nly occasionally will a

prima facie case plus pretext fall short of the burden a plaintiff carries to reach a jury on the ultimate question of discrimination...." Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87, 94 (2d Cir. 2001).

At the summary judgment stage, the Court should not make any finding as to whether [a defendants] reason was, in fact, false. Rather, the Court must determine whether, after casting all of the facts of the case in the light most favorable to [the plaintiff] and drawing all inferences from those facts in favor of [the plaintiff], a rational jury could come to the conclusion that [the defendants] justification for [a particular action] is false. Peralta V. Cendant Corp 123 F.Supp.3d 65 (2000) "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir. 1996).

### COMPLAINANT WISHES TO AMEND THE COMPLAINT TO REFLECT ACTION AGAINST DEFENDANT WATTS-ELDER IN HER INDIVIDUAL CAPACITY

Under the Eleventh Amendment, States enjoy an immunity from suit in federal court by all private parties for all causes of action, including suits arising under federal statutes. Pennhurst State School and Hosp. v. Halderman, 465 U.S. 89, 98, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). This immunity applies to State agencies and departments, as well.

Moreover, since official capacity suits are regarded as another form of claim against the State itself, the Eleventh Amendment likewise bars actions instituted against individually named State officials sued in their official capacities. Kentucky v. Graham, 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). The sovereign immunity doctrine, however, does not bar claims against individual defendants sued in their individual capacities. Hafer v. Melo, 502 U.S. 21, 25-27, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991).

To that extent, the plaintiff hereby requests leave to amend her complaint to cure the technical defect and reflect an action against defendant Cynthia Watts-Elder in her individual capacity.

### PLAINTIFF CAN PROVE A PRIMA FACIE CASE AGAINST DEFENDANT APPLETON UNDER BOTH 42 USC §§1981 AND 1983

Intentional discrimination on the basis of race or sex by a government employer may be covered by section 1983 as an Equal Protection violation. Quinn v. Nassau County Police Dept., 53 F.Supp.2d 347, 356 (E.D.N.Y.1999). Section 1983 imposes liability on persons who, under color of law, deprive United States citizens of the "rights, privileges, and immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Denial of equal protection and violation of § 1981 both require purposeful discrimination. General Building Contractors Ass'n, Inc. v. Pennsylvania, 458 U.S. 375, 391, 102 S.Ct.

3141, 73 L.Ed.2d 835 (1982).

In the case at hand, the plaintiff has demonstrated that defendant Appleton treated her differently than similarly situated employees and that the treatment was motivated in part by race. Specifically plaintiff has named at least one other employee, Kathy Stone, that was treated vastly differently than the plaintiff.

Title 42 U.S.C. § 1981 "prohibits racial discrimination in the making and enforcement of private contracts." A plaintiff must satisfy three elements: (I) the plaintiff must have applied and be qualified for an available position; (ii) the plaintiff's application must have been rejected; and (iii) subsequent to plaintiff's rejection, the employer must either have continued to seek applicants for the position or filled it with a person with the same qualifications as plaintiff. Patterson v. McLean Credit Union, 491 U.S. 164, 177, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989); Texas Dep't. of Community Affairs v. Burdine, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 ( 1981 ).

The analysis for a §1981 action is similar to that of Title VII. To that extent, the plaintiff relies on arguments previously made in support of her Title VII claim.

In Connecticut, "[u]nder the doctrine of res judicata, or claim preclusion, a former judgment on a claim, if rendered on the merits, is an absolute bar to a subsequent action on the same claim. A judgment is final not only as to every matter which was offered to

sustain the claim, but also as to any other admissible matter which *might have been*
*offered* for that purpose." DeMilo & Co. v. Commissioner of Motor Vehicles, 233 Conn.
281, 292, 659 A.2d 162 (1995) (citations and internal quotations omitted; emphasis in
original).  Commissioner of Environmental Protection v. Connecticut Bldg. Wrecking
Co., 227 Conn. 175, 188, 629 A.2d 1116 (1993) ("claim preclusion prevents the pursuit
of any claims relating to the cause of action which were actually made or might have
been made.") (citations and internal quotations omitted).

 Connecticut courts have adopted the "transaction test" of the Restatement (Second)
"to determine whether an action involves the same claim as an earlier action so as to
trigger operation of the doctrine of [claim preclusion]." Connecticut Bldg. Wrecking Co.,
227 Conn. at 189, 629 A.2d 1116.   Section 24 of the Restatement (Second) provides:

> the claim [that is] extinguished includes all rights of the plaintiff to remedies
> against the defendant with respect to all or any part of the transaction, or series of
> connected transactions, out of which the action arose. What factual grouping
> constitutes a 'transaction,' and what groupings constitute a 'series', are to be
> determined pragmatically, giving weight to such considerations as whether the facts
> are related in time, space, origin, or motivation, whether they form a convenient
> trial unit, and whether their treatment as a unit conforms to the parties' expectations

or business understanding or usage.

In applying the "transactional test", Connecticut courts "compare the complaint in the second action with the pleadings and the judgment of the first action." Connecticut Bldg. Wrecking Co., 227 Conn. at 190, 629 A.2d 1116. The claim preclusion doctrine bars a subsequent action only between the **same parties** or those in privity with them. Connecticut Bldg. Wrecking Co., 227 Conn. at 188, 629 A.2d 1116.

Connecticut looks to the Restatement (Second) § 51 for guidance in resolving such privity questions. *See id.* at 194, 629 A.2d 1116. Section 51 provides:

> If two persons have a relationship such that one of them is vicariously responsible for the conduct of the other, and an action is brought by the injured person against one of them, the judgment in the action has the preclusive effects against the injured person in a subsequent action against the other.

In the case at hand defendant Leanne Appleton was never named as a defendant in any of the previous actions the defendant cites. Thus the plaintiff has not had a full and fair opportunity to litigate her action against defendant Appleton. Furthermore the plaintiff has not proceeded on a theory of vicarious liability. Defendant Appleton is sued in her individual capacity.

In Connecticut, issue preclusion prohibits the re-litigation of issues which were 1)

24

actually litigated, and 2) necessarily determined, in a prior action. <u>Commissioner of Motor Vehicles v. DeMilo & Co.</u>, 233 Conn. 254, 267, 659 A.2d 148 (1995). First, "[a]n issue is actually litigated if it is properly raised in the pleadings, submitted for determination, and in fact determined." <u>Carol Management Corp. v. Board of Tax Review,</u> 228 Conn. 23, 32, 633 A.2d 1368 (1993). Second, "[a]n issue is necessarily determined if, in the absence of a determination of the issue, judgment could not have been validly rendered." <u>Carol Management Corp.</u>, 228 Conn. at 33, 633 A.2d 1368. Finally, in addition to the requirements above, to invoke the doctrine of issue preclusion the issues sought to be litigated in the second proceeding must be identical to those in the first. <u>Jones</u>, 220 Conn. at 297, 596 A.2d 414.

Again, the plaintiff has not "litigated" the issues she is raising against defendant Appleton in the pendent action. Defendant Appleton has not been named in any previous action. No court or agency has determined whether or not the plaintiff's constitutional rights have been violated.

Finally the defendants attempt to shield defendant Appleton from personal liability, by claiming that defendant Watts-Elder was the real culprit, is disingenuous. Plaintiff accurately recounts numerous occasions where Appleton acted without the guidance of Watts-Elder to discriminate against and violate the plaintiff's rights. In fact, the plaintiff

25

looked to Watts-Elder for guidance when Appleton was taking the many steps against

her. Specifically, Appleton sent document after document to the plaintiff claiming that

the plaintiff was not performing her job properly when in fact she was. (exhibit )

Appleton raised her voice at plaintiff and attempted to force her to have a meeting

without union representation. Appleton indicated from the outset to the plaintiff that it

was not her choice to hire the plaintiff. Appleton kept in touch with plaintiff's previous

supervisors at OPM to continue the rash of harassment. Appleton further WARNED

other employees about the plaintiff prior to the plaintiff beginning to work for CHRO.

(exhibit 88, affidavit of Tracy Brown) There is sufficient evidence to demonstrate that

Appleton had personal involvement in the constitutional violations.

## THE INDIVIDUAL DEFENDANTS ARE NOT ENTITLED
## TO QUALIFIED IMMUNITY

As the defendants correctly recount, in a §1983 action, a public officer may be

shielded from liability in his individual capacity based on qualified immunity if his

conduct did not violate "clearly established statutory or constitutional rights of which a

reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102

S.Ct. 2727, 73 L.Ed.2d 396 (1982); Shechter v. Comptroller of the City of New York, 79

F.3d 265, 268 (2d Cir.1996). However, the Second Circuit has, as with other aspects of

26

summary judgment, severely limited the ability of the trial courts to act. *See Castro,* 34

F.3d at 112; Oliveira v. Mayer, 23 F.3d 642, 649 (2d Cir.1994) (holding that the

immunity issue should be decided by the court only where the facts concerning its

availability are undisputed; otherwise, jury consideration is required), *cert. denied,* 513

U.S. 1076, 115 S.Ct. 721, 130 L.Ed.2d 627 (1995); Frank v. Relin, 1 F.3d 1317 (2d Cir.),

*cert. denied,* 510 U.S. 1012, 114 S.Ct. 604, 126 L.Ed.2d 569 (1993); Warren v. Dwyer,

906 F.2d 70, 74 (2d Cir.), *cert. denied,* 498 U.S. 967, 111 S.Ct. 431, 112 L.Ed.2d 414

(1990)

    In the case at hand, there are not only facts in dispute, but an abundance of evidence

corroborating the plaintiff's testimony that defendant Appleton violated the plaintiff's

rights. (exhibits 87, 88)  As a long time state employee of a Civil Right's agency,

defendant Appleton is very aware of the plaintiff's clearly established rights to be free of

race discrimination and differential treatment.  Defendant Appleton's conduct was not

only harassing, but threatening and abusive at times.

## PLAINTIFF'S ACTION IS NOT BARRED BY FEDERAL ARBITRATION ACT

    The Federal Arbitration Act ("FAA") provides in relevant part that "[a] written

provision in . . . a contract evidencing a transaction involving commerce to settle by

arbitration a controversy thereafter arising out of such contract . . . shall be valid,

irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

The courts that have considered the question of the enforceability of mandatory predispute arbitration agreements in the Title VII context have reached conflicting results. *Compare* Duffield v. Robertson Stephens & Co., 144 F.3d 1182 (9th Cir.1998) (holding that an employer may not require, as a condition to employment, that all employees waive their right to bring Title VII claims in a judicial forum and agree, in advance, to submit their Title VII claims to binding arbitration); Winkler v. Pacific Brokerage Services, Inc., No. 97 C 7340, 1998 WL 341622 (N.D.Ill. June 19, 1998) (same); *Rosenberg, supra* (same); with Cole v. Burns Int'l Security Services, 105 F.3d 1465 (D.C.Cir.1997) (upholding an arbitration agreement that required an employee to submit his Title VII claims to arbitration where there were sufficient safeguards to ensure that the arbitration was in a neutral forum); Mouton v. Metropolitan Life Ins. Co., 147 F.3d 453 (5th Cir.1998) (upholding a pre-dispute, mandatory arbitration clause in the Title VII context

In analyzing this question, the Court employed the multi-pronged test enunciated by the Second Circuit in Genesco, Inc. v. T. Kakiuchi & Co., Ltd., 815 F.2d 840, 844 (2d Cir.1987), often referred to as the "*Genesco* test."(fn5) First, the court must determine

whether the parties entered into a valid arbitration agreement. *Id.* 815 F.2d at 845-46.

Second, it must determine whether the dispute between the parties falls within the scope

of the arbitration clause. *Id.* 815 F.2d at 846-47. Third, if federal statutory claims are

asserted, the court must determine whether Congress intended the claims to be

nonarbitrable. *Id.* 815 F.2d at 848. Fourth, if the court concludes that some, but not all of

the claims in the case are arbitrable, it must then determine whether to stay the balance of

the proceedings pending arbitration. *Id.* 815 F.2d at 844.

Title VII gives a person aggrieved by an alleged unlawful employment practice

the statutory right to file a civil action after exhausting administrative remedies. 42

U.S.C. § 2000e-5(f)(1). As amended by the Civil Rights Act of 1991, § 102, 105 Stat.

1072, 42 U.S.C. § 1981a, Title VII now provides for a right to trial by jury if the

aggrieved party is seeking compensatory or punitive damages. 42 U.S.C. § 1981a(c)(1). It

would seem that this statutory right alone would be sufficient to create a "legitimate

expectation" on the part of the plaintiff as to her right to file her discrimination suit in

federal court, which under Connecticut law could not be abridged unilaterally by the

defendant. However, in light of a number of federal cases upholding mandatory

arbitration of statutory claims - including employment discrimination claims - further

analysis of this issue is warranted.

29

In <u>Alexander v. Gardner-Denver Co.</u>, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), the Supreme Court held that an employee's statutory right to trial *de novo* under Title VII could not be foreclosed by the prior submission of his claim to final arbitration under a nondiscrimination clause in a collective bargaining agreement. The Court stated, "we think it clear that there can be no prospective waiver of an employee's rights under Title VII." *Id.* 415 U.S. at 51, 94 S.Ct. 1011. Because Title VII concerns an individual's rights to equal employment opportunity, the Court held that "an employee's rights under Title VII are not susceptible of prospective waiver." *Id.* 415 U.S. at 51-52, 94 S.Ct. 1011. "The purpose and procedures of Title VII indicate that Congress intended federal courts to exercise final responsibility for enforcement of Title VII; deferral to arbitral decisions would be inconsistent with that goal." *Id.* 415 U.S. at 56, 94 S.Ct. 1011. Rejecting the argument that arbitral processes are commensurate with judicial processes, the Court found that arbitral procedures, "while well suited to the resolution of contractual disputes, make arbitration a comparatively inappropriate forum for the final resolution of rights created by Title VII." *Id. See generally* <u>Duffield</u>, 144 F.3d at 1188 (noting that, prior to 1991, <u>Gardner-Denver</u> was widely interpreted as prohibiting any form of compulsory arbitration of Title VII claims).

In subsequent cases, the Supreme Court reaffirmed that Title VII has always looked to the federal courts for enforcement. Kremer v. Chemical Constr. Corp., 456 U.S. 461, 468, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982) (stating that the federal courts were entrusted with the ultimate enforcement responsibility under Title VII); New York Gaslight Club, Inc. v. Carey, 447 U.S. 54, 64, 100 S.Ct. 2024, 64 L.Ed.2d 723 (1980) (stating that the ultimate authority to secure compliance with Title VII resides in the federal courts).

In 1991, the Supreme Court decided Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), which held that an Age Discrimination in Employment Act ("ADEA") claim was subject to compulsory arbitration pursuant to an arbitration agreement in a securities registration application. Gilmer distinguished Gardner-Denver, and its progeny, Barrentine v. Arkansas-Best Freight System, Inc., 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981), and McDonald v. City of West Branch, 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984), on three grounds. First, the Court held that those cases did not involve the issue of the enforceability of an agreement to arbitrate statutory claims. Rather, they involved the quite different issue of whether arbitration of contract-based claims precluded subsequent judicial resolution of statutory claims. Second, the Court held that arbitration in those cases occurred in the context of a collective bargaining agreement, where the claimants were represented by

31

their unions, thus raising a concern about the tension between collective representation

and individual statutory rights. Third, the Court noted that those cases were not decided

under the FAA. 500 U.S. at 35, 111 S.Ct. 1647. Significantly, however, in distinguishing

Gardner-Denver, Gilmer did not address the differences or similarities between the

ADEA and Title VII.

The "obvious[ ] . . . tension" between these two lines of cases was recently

recognized - but not resolved - by the Supreme Court in Wright v. Universal Maritime

Service Corp., 525 U.S. 79, 119 S.Ct. 391 (1998). The Court held that, although an

employee's statutory right to a judicial forum for claims of employment discrimination is

not a substantive right, "Gardner-Denver at least stands for the proposition that the right

to a federal judicial forum is of sufficient importance to be protected against less-than-

explicit union waiver in a [collective bargaining agreement]." The Court, however,

declined to decide the issue of "whether or not Gardner-Denver's seemingly absolute

prohibition of union waiver of employees' federal forum rights survives Gilmer."

The same year that Gilmer was decided, Congress passed the 1991 Civil Rights Act,

which increased the remedies available under Title VII and amended the substantive and

procedural provisions of Title VII to make enforcement of the Act more effective. See

Rosenberg, 995 F.Supp. at 200; see also Duffield, 144 F.3d at 1191. "In the context of the

32

Act's significant enlargement of the substantive and procedural rights of victims of

employment discrimination, Congress also included what Chief Judge Posner has termed

'a polite bow to the popularity of alternate dispute resolution.'" <u>Duffield</u>, 144 F.3d at 1191

(citing <u>Pryner v. Tractor Supply Co.</u>, 109 F.3d 354, 363 (7th Cir.), *cert. denied,* 118 S.Ct.

294, 139 L.Ed.2d 227 (1997)).

   The legislative history of the 1991 amendment is also telling.

> The use of alternative dispute resolution mechanisms is intended to supplement, not supplant, the remedies provided by Title VII. Thus, for example, the Committee believes that any agreement to submit disputed issues to arbitration, whether in the context of a collective bargaining agreement or in an employment contract, does not preclude the affected person from seeking relief under the enforcement provisions of Title VII. This view is consistent with the Supreme Court's interpretation in <u>Alexander v. Gardner-Denver Co.,</u> 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). The Committee does not intend this section to be used to preclude rights and remedies that would otherwise be available.

H.R.Rep. No. 40(II) at 1)

   Thus, from the legislative history it appears that Congress, in enacting the 1991

Civil Rights Act, endorsed voluntary alternative dispute resolution but never intended

arbitration or other alternative dispute resolution mechanisms to be used as a vehicle for

denying Title VII claimants their day in court. <u>Martens</u>, 181 F.R.D. at 258. As the Ninth

Circuit stated in <u>Duffield</u>, "the legislative history of the Act makes it absolutely clear that

Congress intended § 118 to codify the <u>Gardner-Denver</u> approach to compulsory

arbitration agreements and to preclude the enforceability of such agreements with respect

to Title VII claims." 144 F.3d at 1198.

The courts have also looked at Congress' directive in the legislative history that Title

VII should be read broadly so as to best effectuate its remedial purposes. *See, e.g., id.* 144

F.3d at 1192. "The purpose of the 1991 Act was uniformly to expand employee's rights

and 'to increase the possible remedies available to civil rights plaintiffs.'" *Id.* (quoting

Prudential Ins. Co. v. Lai, 42 F.3d at 1304). As the court in Duffield stated:

> It, thus, would be at least a mild paradox to conclude that in the very Act of
> which the primary purpose was to strengthen existing protections and remedies
> available to employees under Title VII, Congress encouraged the use of a process
> whereby employers condition employment on their prospective employees'
> surrendering their rights to a judicial forum for the resolution of all future claims
> of race or sex discrimination and force those employees to submit all such claims
> to compulsory arbitration. It seems more plausible that Congress meant to
> encourage *voluntary* agreements to arbitrate - agreements such as those that
> employers and employees enter into after a dispute has arisen because *both* parties
> consider arbitration to be a more satisfactory or expeditious method of resolving
> the disagreement.

Duffield, 144 F.3d at 1192-93 (quoting Pryner, 109 F.3d at 363.

The EEOC, which is charged with the interpretation and enforcement of the

federal employment discrimination laws, has adopted a similar position in a Notice No.

915.002, dated July 10, 1997. In this Policy Statement on Mandatory Arbitration, the

EEOC takes the position that agreements that mandate binding arbitration of

discrimination claims as a condition of employment are contrary to the fundamental

principles evinced in these laws. EEOC Notice No. 915.002 ¶ 7. The EEOC noted the

increasing frequency with which employers are requiring applicants and employees to

give up their rights to pursue employment discrimination claims in court and to agree to

resolve disputed claims through binding arbitration. After discussing the history of the

civil rights legislation and the role that the federal courts play in the overall enforcement

scheme, the EEOC stated that "[t]he private right of access to the judicial forum to

adjudicate claims is an essential part of the statutory enforcement scheme. . . . The courts

cannot fulfill their enforcement role if individuals do not have access to the judicial

forum." *Id.* ¶ D. Citing <u>Christiansburg Garment Co. v. EEOC</u>, 434 U.S. 412, 418, 98

S.Ct. 694, 54 L.Ed.2d 648 (1978), the EEOC stated that, by bringing a claim in court, a

civil rights plaintiff serves not only his or her private interests, but also serves as "the

chosen instrument of Congress to vindicate a policy that Congress considered of the

highest priority." *Id.* (internal citations and quotations omitted). Based upon these general

principles, the EEOC opposed the "privatization" of enforcement of federal

discrimination laws through private arbitrators.

    Additionally, the EEOC challenged the limitations of the arbitral process, arguing

that even the fairest of arbitrations is private in nature and thus allows for little public

accountability. Also, arbitration, by its very nature, does not allow for the development of the law, and adversely affects the EEOC's ability to enforce the Civil Rights Laws. Accordingly, the EEOC stated that it would continue to process charges regardless of whether the charging party had agreed to arbitrate employment disputes. *Id.*

**CONCLUSION**

For the reasons stated above, the plaintiff respectfully request that the motion for summary judgment be denied.

THE PLAINTIFF

BY: _____
     Cynthia R. Jennings
     THE Barrister Law Group, LLC
     211 State Street
     Bridgeport, CT 06604
     Fed. No. ct21797
     Tel:    203-334-4800
     Fax:    203-333-7178
     Her Attorney

36

## CERTIFICATION

This is to certify that a copy of Plaintiff's Memorandum of Law, Local Rule 56(b) Statement and Exhibits in Opposition to Defendant, State of Connecticut, et al's Summary Judgment Motion and 56(a) Statement was hand delivered on September 27, 2004, to the Court and the Attorney General's office and sent via U.S. Mail to all other Counsel of Record as shown below:

Joseph A. Jordano
Assistant Attorney General
Office of the Attorney General
55 Elm Street
Hartford, CT 06141

Jack V. Genovese II
Genovese, Vehslage & LaRose
500 Enterprise Drive
Rocky Hill, CT 06067

Brian A. Doyle
Ferguson, Doyle & Springer
35 Marshall Rd.
Rocky Hill, CT 06067

Cynthia R. Jennings, Esq.,