UNITED STATES DISTRICT COURT
DISTRICT OF Connecticut

- - - - - - - - - - - - - - - - - x
                     |

LEONYER M. RICHARDSON,
        Plaintiff,      |           Case Number
                            3:02CV625(AVC)
    VS.                |

STATE OF CONNECTICUT,
CONNECTICUT COMMISSION ON
HUMAN RIGHTS, OFFICE POLICY
AND MANAGEMENT, CFEPE-AFT,
AFL-CIO, ET AL.,      |
      Defendants.            September 22, 2004
- - - - - - - - - - - - - - - - x

## PLAINTIFF'S RULE 56(b) STATEMENT OF MATERIAL FACTS

1.  Admit.

2.  Deny.  Plaintiff was not a drill sergeant for the U.S. Army until 1985. (See
    Exhibit 1)

3.  Admit.

4.  Deny.  Plaintiff began her state employment with the Department of
    Environmental Protection ("DEP"), on May 11, 1981.  Plaintiff started as a
    clerk typist and based on her good work and merit had numerous promotions
    and was a Fiscal Administrative Officer at the time she left state employment.
    (See Exhibit 2) Plaintiff had no history of behavioral problems nor did she
    receive any reprimands up and until the alleged threat to a co-worker, Ms.
    Smith on October 30, 1996. The incident was a verbal altercation between both

workers and when Plaintiff was the only one reprimanded, Plaintiff did a

rebuttal. (See Exhibit 3) Plaintiff grieved the incident and according to the

Union contract, this incident should not have even appeared for Defendant's

Rule 56(a) Statement of Material Facts as it should have been expunged from

Plaintiff's file. (See Exhibits 4)

Throughout Defendant's Rule 56(a), Defendant distorts the facts and continues

to discriminate against Plaintiff. The fact that Defendant's second statement

mentions Plaintiff's U.S. Army history as a drill sergeant shows that Defendant

continues to paint a very unfounded derogatory and discriminative picture of

the Plaintiff. Defendants needed to create a paper trail in order to dismiss

Plaintiff from employment.

5.    Deny. Once again this statement is not true. George Barone was Plaintiff's

supervisor at the time and the discipline came from the bureau chief. There

were many problems with the discipline handed out to Plaintiff and Plaintiff

filed a rebuttal. (See Exhibit 5) Dave Mitchell, Plaintiff's union steward

handled the matter and told Plaintiff that her paycheck would be readjusted and

"don't worry about it" because the matter was settled and the outcome was in

the Plaintiff's favor. Plaintiff was transferred to another state agency. (See

Exhibit 6)

6.    Admit.

7.    Deny. The word Defendant used "casual" denotes very limited social contact.

However, Plaintiff and Watts Elder were very good friends. Plaintiff and Watts

Elder met at DEP, would go to lunch in downtown Hartford on many occasions during lunch break. Watts Elder also invited Plaintiff to her home and her church and Plaintiff went on numerous occasions. (See Exhibit 7)

8.  Deny. Plaintiff talked to Watts Elder on many occasions about the unjust incident that happened in October, 1996. However, the incident was resolved and Plaintiff was being transferred to OPM. (See Exhibit 8)

9.  No number 9.

10.  Deny. The reason why Watts Elder, also an African American female, gave Richardson a reference for a position at OPM was to help facilitate getting her out of a bad situation at DEP where she was being discriminated against. (See Exhibit 9)

11.  Deny. Plaintiff and Watts Elder were very good friends. Plaintiff and Watts Elder met at DEP, would go to lunch in downtown Hartford on many occasions during lunch break. Watts Elder also invited Plaintiff to her home and her church and Plaintiff went on numerous occasions. (See Exhibit 9)

12.  Deny. The transfer to OPM was part of the resolution in regard to Plaintiff's grievance that Dave Mitchell handled in October, 1996. (See Exhibit 10)

13.  Deny. The Plaintiff walked into a hostile environment. The staff at OPM was surprised that another black person was hired and commented on it. Elaine Shrew was also responsible for moving Plaintiff from her workspace and placing Plaintiff away from the rest of the staff. Plaintiff's old workspace

given it to someone else of a different color and race. (See Exhibit 11) Elaine

Shrew, did not initiate training of Plaintiff. It was only when Plaintiff

requested training that Elaine Shrew consented to her receiving training from

her co-workers. (See Exhibit 12)

14. Deny. This was no mere random act. The Plaintiff's desk was "ram shacked"

for over three months. When it was clear that the violence was not an accident,

Plaintiff reported this to the cleaning people who were questioned and they

denied touching Plaintiff's desk. The Plaintiff took pictures of the destruction

of her desk. Cameras were set up to ascertain the problem and according to the

tape, all it showed was that the cord of the vacuum cleaner was dragged across

her desk occasionally, thus moving some of her personal items on Plaintiff's

desk. This again is not true. Plaintiff took pictures of her desk when the camera

was removed. The pictures clearly show that each day, Plaintiff's personal

things were visibly moved, not from a cord of a vacuum cleaner, but a person.

(See Exhibit 13) It is hard to believe that no other similarly situated "desk" was

accidentally disturbed due to a cleaning cord. It is also hard to believe that if

the private cleaning company accidentally disheveled Plaintiff's desk, they

would leave it in that terrible state for Plaintiff to find the next day. (See

Exhibit 14)

15. Admit.

16. Deny. On August 18, 2000, OPM filed a detailed comprehensive answer to

Complaint #0010435 in which it denied every one of Plaintiff's discrimination

claims, and stated that Plaintiff's accusations were false. The documents presented did not fully represent Plaintiff's behavior. The evidence submitted was biased and used in an attempt to discredit Plaintiff. (See Exhibit 15)

17. Neither admits nor denies.

18. Neither admits nor denies.

19. Admit.

20. Admit. Watts Elder knew due to talks with Plaintiff that Plaintiff would not stand back and be discriminated against. Watts Elder agreed to accept Plaintiff as a transfer to CHRO. (See Exhibit 16)

21. Deny. When Plaintiff found herself in yet another situation where her "color" was not acceptable, she wanted to rescind her withdrawal of the complaint against OPM. Plaintiff realized that she was placed into a work environment that was hostile and hazardous to her career. Plaintiff wanted to retract her signature from the Agreement. (See Exhibit 16A)

22. Deny. Ms. Appleton is not competent as a business manager. At times, being a manager negates flexibility and dealing with each co-worker with respect and decency. Many of her employees felt as though Ms. Appleton was discriminatory and demeaning. (See Exhibit 17) Joseph Zakrzewski, Plaintiff's union steward with the Administrative and Residual Union Local 4200 wrote a response to the charges levied against Plaintiff and stated that Defendant did not provide relevant documents he requested. Ms. Appleton further denied his written request to meet with the very people from

whom she obtained affidavits (Walton, Stone, Spann, Gunn and Davis). (See Exhibit 18) Defendant Ms. Appleton had a history of abusive behavior, which fit the profile of a workplace bully. (See Exhibit 19) There were also many who actually witnessed Ms. Appleton's dislike of Plaintiff and commented that the hostility and threatening behavior was not one-sided. (See Exhibit 20) Although it is said that Ms. Appleton knows her job and the regulations governing business operations for state agencies, apparently this does not hold her true to allegations of misappropriation. (See Exhibit 21)

23. Deny.  Upon Plaintiff's transfer from OPM to CHRO, Plaintiff was harassed and it was becoming clearly evident that the supervisors at CHRO were not interested in having Plaintiff work with them as a lateral transferred Fiscal Administration Officer. (See Exhibit 22)  Plaintiff was illegally locked out of the SAAS system and this prevented her from performing her job.  Watts Elder was aware of this. (See Exhibit 23)

24. Deny.  It was never proven by Defendant that Plaintiff used another employee's user-id and password to access the system in order to make changes.  The Plaintiff *used* to have her own user-id and password to access the system in order to make changes.  They were taken away without warning or notice by Defendant, Ms. Appleton. (See Exhibit 24)  Plaintiff merely checked with other co-workers who were already logged on to their computer to see whether it was her personal computer or if it was a SAARs computer program error. (See Exhibit 25) Kathy Stone wrote confirming Plaintiff's explanation to be

true. (See Exhibit 26) Another co-worker Tracey Brown also wrote confirming Plaintiff's story. (See Exhibit 27) In a normal setting, this would have been an obvious mistake on the part of the Defendant, Ms. Appleton and an apology granted. Instead, Plaintiff was sternly warned and a written reprimand to place in Plaintiff's file was produced and used as part of Defendants' evidence against Plaintiff. (See Exhibit 28) Part of Plaintiff's job was to reconcile accounts. The word reconcile means to: "to settle or resolve, to make compatible or consistent, to check (a financial account) against another for accuracy." Plaintiff continued to do her job and found discrepancies, which she reported to Ms. Appleton. (See Exhibit 29) Ms. Appleton felt that Plaintiff was defying her orders because she did not want to acknowledge the fact that there was something wrong with the monetary distributions in the accounts. (See Exhibits 30)

25.  Admit.

26.  Deny. This written warning was just another flagrant disregard for Plaintiff and her position as Fiscal Administrative Officer. Ms. Appleton assigned the Plaintiff the job of deposit slips. Plaintiff thus began making the proper contacts needed to complete her job. Ms. Appleton then censored Plaintiff from having any contact with the comptrollers, DOIT or any state agency without her consent. Plaintiff contacted Ms. Appleton for an explanation of the censure and was given a written warning. (See Exhibit 31) Plaintiff then contacted Watts Elder to let her know of the censorship and the discriminatory

restraint put upon her, which did not allow her to fully accomplish her job. (See Exhibit 32) It should also be noted for a period of time, the job of depositing monies was taken away from Plaintiff. (See Exhibit 33)

27. Admit.

28. Deny. Ms. Appleton was not concerned about the correction of the reports in as much as she was concerned about Plaintiff not questioning the inconsistencies appearing on the reports. Plaintiff continued to point out several misappropriations of funds to each account and merely questioned the way that the calculations were done. Plaintiff also realized that the miscalculations may not be mistakes and immediately reported through emails the misrepresentation of the reports to Watts Elder. (See Exhibit 34) Plaintiff also began to email her union steward to show him how the reports should look and how Ms. Appleton was not concerned about that, but concerned about them being done according to her method with no questions asked. (See Exhibit 35)

29. Deny. In layman's terms, Ms. Appleton was asking Plaintiff to lie or ignore the miscalculations and use the calculation done by Broadcannon. Ms Appleton now sought the advice of OPM because Plaintiff was adamant about not signing on to any misappropriation nor would Plaintiff misrepresent information with regards to money that was being handled by CHRO. (See Exhibit 36)

30. Admit.

31. Admit.

32. Admit.

33. Admit.

34. Deny. Plaintiff explained in detail what her job entailed. Plaintiff did her job
    very well for many years under other state agencies. Plaintiff could not under
    oath at her deposition give calculations for questions posed when all of the
    information needed for her to calculate a response was not presented. This was
    a perfect scenario at the deposition to show that Plaintiff could not correct nor
    could she recalculate information if there were inconsistencies or
    misappropriations. (See Exhibit 37) Please also be reminded that during this
    whole situation, Watts Elder and Plaintiff's union received copies of the Energy
    Consumption reports and emails of how Plaintiff calculated her reports and at
    no time did either of them reply to Plaintiff that the way she calculated her
    responses was incorrect. (See Exhibit 38)

35. Deny. Impartiality was not insured. Firstly, the personnel Consultant agency
    that Watts Elder hired was not licensed to do business with the State. (See
    Exhibit 39) Further, Plaintiff was not given due process. Plaintiff's union was
    not aware of this investigation until after the agency was hired and started their
    investigation. However, Ms. Appleton, and other supervisors were informed
    prior to the investigation starting. (See Exhibit 40)

36. Deny. As there was no formal training or notes with regards to the processing
    of deposit slips, Plaintiff relied on the instructions of her co-worker (Stone)
    who did them prior to the Plaintiff. According to Stone, the deposits were

collected until they reached a certain denomination and then sent to the bank

for deposit. (See Exhibit 41) This was the process for numerous years and was

never questioned, nor was Stone ever written up, verbally warned or told that

this was incorrect. (See Exhibit 42)  Once Plaintiff reminded Ms. Appleton of

this fact, Ms. Appleton instituted a "new" rule, which was to be followed. (See

Exhibit 43)  In addition to that, Plaintiff was continually harassed and

discriminated in the fact that now after almost twenty years of working with

state agencies, Ms. Appleton singles her out as a culprit who abuses flex and

sick time. This was proved to be an unfounded complaint and should be noted

as another attempt for Defendant to create a false paper trail to use against

Plaintiff.  (See Exhibit 44) Co-worker Tracey Brown emailed Ms. Appleton to

respond to her false allegation against Plaintiff. (See Exhibit 45)  Also, union

steward Joseph Zacrzewski grieved the many reprimands from Appleton and

labeled her a workplace bully. (See Exhibit 46)

37.  Admit.  Defendant Ms. Appleton herself states that the procedure for checks

was not to deposit them right away, but as was done in the past to hold the

checks until enough money was collected and deposits them.  This in no way

reflects on Plaintiff's ability to do her job.  Also, before this memo was written,

Plaintiff was on administrative leave.  Ms. Stone, Plaintiff's co-worker had the

folder with the checks and held them for weeks as instructed by Ms. Appleton.

The folder was returned to Plaintiff upon her return and the harassment began again with Ms. Appleton threatening disciplinary action including dismissal for failure to abide by these "new" rules. (See Exhibit 43)

38. Admit.  As stated in paragraph 37, Ms. Appleton did not abuse, discipline or dismiss Ms. Stone, another similarly situated white female doing the same job for not depositing the checks in a timely fashion.  (See Exhibit 42)

39. Admit.  Although Plaintiff was given a letter by investigator Williams, Plaintiff was in and out of the office on sick time due to stress evoked sickness relating to her employment (See Exhibit 47)

40. Admit.  Plaintiff stated and showed the investigator proof that she was being harassed and that Ms. Appleton was inappropriately setting the tone of the workplace by her continuous demands and "direct" approach.  (See Exhibit 48). The fact is that Plaintiff had no choice but to use her constitutional right to grieve each and every discriminatory and abusive act that the Defendants set against her. (See Exhibit 49)

41. Deny.  The union did not arbritrate on Plaintiff's behalf.

42. Admit.  It was very clear that Defendant was trying to set a paper trial of insubordination against Plaintiff.  Ms. Appleton knew why the deposits were not made.  Plaintiff provided Ms. Appleton with an explanation (See Exhibit 50) Ms. Appleton knew that the Plaintiff was on leave and Ms. Appleton also knew that Ms. Stone had the deposits up and until that time and that they were not made.  The question again is not how come there was no explanation of

why deposits were not made, but why the deposits were held and not done

**_prior_** to Plaintiff returning from leave. Ms. Appleton had access to Plaintiff's

desk and computer. (See Exhibit 51) Once again, Defendant is discriminating

in that it chooses to highlight only the fact that emails were sent regarding

Plaintiff's work habits, however, the emails do not show the previous devious

activity of the Defendant to make a paper trial to use as evidence to dismiss

Plaintiff. Kathy Stone told Plaintiff in an email to be careful about what she

wrote because it was being used against her. (See Exhibit 52)

43. Admit.

44. Admit. Although Plaintiff was put on paid administrative leave by Watts Elder.
    Plaintiff was denied due process because neither she nor her union steward was
    informed of the charges levied against her. (See Exhibit 53)

45. Admit.

46. Deny. Plaintiff believes that other similarly situated white CHRO employees
    were treated differently than her. One case in point is the fact that Ms. Stone, a
    similarly situated white CHRO employee who held the checks that were
    deposited late was not disciplined nor reprimanded for not depositing these
    same checks. (See Exhibit 42) CHRO employees James Davis, Lummie Span
    and Cheryl Gunn were told that Plaintiff was a snitch and to stay away from
    her. This was because Plaintiff questioned the accuracy of Defendants
    accounting when it came to state reports. (See Exhibit 54)

47.  Neither admits nor denies.  Plaintiff nor her union steward ever received a copy
     of said report.

48.  Admit.  The Defendant did obtain sworn affidavits from CHRO employees.
     However, Plaintiff has as fact that there were obviously some CHRO
     employees that were not interviewed or their Affidavits were not used by the
     agency. (See Exhibit 55) Thus this investigation was one sided and Plaintiff
     was not given due process.  (See Exhibit 56)

49.  Admit.  Defendant Ms. Appleton knew that this was not possible as she was the
     one that took the access from the SAARS program away from Plaintiff.
     Plaintiff could not go into the program to do what was requested of her.
     Plaintiff did the report to the best of her ability with the limited information she
     was privy to. (See Exhibit 57)

50.  Deny.  Plaintiff emailed Ms. Appleton the report and the explanation of what
     was done.  The problem was that Plaintiff was not going to place herself in a
     situation where she was going to be responsible for the misappropriation and
     misrepresentation of state monies. (See Exhibit 59)

51.  Admit.  Plaintiff emailed Ms. Appleton the report and the explanation of what
     was done.  The problem was that Plaintiff was not going to place herself in a
     situation where she was going to be responsible for the misappropriation and
     misrepresentation of state monies. (See Exhibit 59)

52.  Neither admits nor denies.  Plaintiff was not privy to this conversation.

53. Denies. Plaintiff gave Ms. Appleton the report each month and copied Watts

Elder and Joseph Zakrzewski to show this. (See Exhibit 60)

54. Admit. Defendant, Ms. Appleton continued to charge the Plaintiff with the

same accusations each month in order to produce a paper trail on Plaintiff.

When asked in a deposition if there was any other person who was treated

similarly, Defendant stated that only another African American female, Femi

Bogle-Assegai was terminated. Surprisingly, Femi Bogle-Assegai had the

same problem of questioning the CHRO's misappropriation of state funds.

55. Admit. Plaintiff received this email and responded that she needed more time

to complete the report, and forward same email to her union steward to show

the patter of harassment. (See Exhibit 61)

56. Admit.

57. Admit. The physical presence was now being used to intimidate the Plaintiff.

Defendant states in the beginning of their Rule 56(a)1 Statement of Material

Facts that Plaintiff was a drill sergeant for the U.S. Army, however, this

statement was false and intended to paint a false picture of the Plaintiff. As

stated, Defendants approached Plaintiff and demanded that Plaintiff stop using

the formula for calculation that Plaintiff used for many years with no questions

nor problems in the other state agencies. Plaintiff's union steward Joseph

Zakrzewski filed a grievance for this unprofessional behavior. (See Exhibit 62)

58. Deny. The Plaintiff became angry because she was being harassed and there

were two people standing over her desk demanding unprofessionally that

Plaintiff do as they stated. (See Exhibit 63)  Once again, this was Ms.

Appleton's way of discriminating and harassing Plaintiff.  Watts Elder was

aware of this (See Exhibit 64)  The other CHRO employees that were sitting

near the whole incident state that there was loud talking from **all of the parties**

**involved**.  (See Exhibit 65).

59.  Neither admits nor denies.  Plaintiff was not privy to that conversation.

60.  Neither admits nor denies.

61.  Deny.  Plaintiff gave Defendant the correct calculation and an explanation of

why it was correct.  (See Exhibit 66)

62.  Deny.  Plaintiff gave Ms. Appleton the correct calculations and the explanation

of why it was correct. (See Exhibit 67)

63.  Admit.

64.  Denies.  Defendants Carlson and Appleton were trying to set the Plaintiff up for

an act of direct insubordination.  Defendant Appleton had Carlson with her, and

Plaintiff had a right to union representation at any time.  (See Exhibit 68)

65.  Neither admits nor denies.  Everyone involved was very upset.  This was

apparent by the statement of the commission attorney, Raymond Pech who

instructed the all to let it go.  Apparently he was not just talking to Plaintiff.

(See Exhibit 69)

66.  Deny.  Plaintiff, who was already suffering from work related stress could not

take the discrimination and having two women cowering over her desk after

she asked them to leave her desk.  Plaintiff was within her rights to remove

herself from the hostile situation as referenced in the Union Contract for Local

4200. (See Exhibit 70) Defendants were obviously too close to Plaintiff if they

were startled when she got up. Plaintiff was more concerned with her health

and needed to remove herself from that situation. (See Exhibit 71)

67. Deny. The Plaintiff went to Murphy Security at CHRO to report the

harassment of her supervisors at CHRO. (See Exhibit 72)

68. Deny. The police took the report and contacted CHRO to investigate the

Plaintiff's actions. The police were told that the situation would be handled in

house. (See Exhibit 73)

69. Neither admits nor denies.

70. Deny. This is a direct lie. The accounts given at that time were not

conclusively supportive of Appleton's version. Plaintiff states that some CHRO

employees were approached by Appleton and asked to sign a statement and not

tell Plaintiff about it. This behavior is suspicious and so any "evidence" that

was given cannot be the only basis of the investigation. Plaintiff's union

steward Joseph Zakrzewski grieved this incident. (See Exhibit 74)

71. Deny. This was all a set up. Watts Elder knew of the situation before it

became a serious problem. (See Exhibit 75). Watts Elder considered Plaintiff

a whistleblower in the fact that she would not comply with Defendants'

misappropriation of state funds. (See Exhibit 76) Plaintiff has a constitutional

right to defend herself against anyone who poses a threat. Two women

cowering over your desk yelling at you was a threat to Plaintiff and Plaintiff

sought police protection. (See Exhibit 73)

72. Deny. Watts Elder knew of the whole situation and sat idly by until it was

evident that Plaintiff would not go along with the criminal activity of

misappropriating funds handled by the CHRO. Watts Elder never responded to

the numerous email where Ms. Appleton was clearly out of line. (See Exhibit

75). Watts Elder needed to make sure that Plaintiff was removed before she

blew the whistle on the whole scam of misappropriation of state funds by the

CHRO agencies. (See Exhibit 77) This again was discriminatory to Plaintiff in

that Plaintiff was not given due process in the claims made against her and was

terminated unjustly. (See Exhibit 78)

73. Admit.

74. Admit.

75. Admit.

76. Admit.

77. Neither admits nor denies.

78. Neither admits nor denies. Donald Bardot told the Plaintiff to contact Warren

Cullen with information that he could use to help Plaintiff secure employment

to state service. (See Exhibit 79)

79. Denies. Donald Bardot told the Plaintiff that he would talk with Warren Cullen

who would work with her in seeking reinstatement or secure other employment

in state service. Warren Cullen told Plaintiff to send him her resume and job

postings that she was interested in and he would look into them on her behalf.

(See Exhibit 80)

80. Neither admits nor denies.

81. Admit.

82. Neither admits nor denies.  The advice from the Union was that reinstatement

or other state service employment would be a better alternative.  This was the

case when Plaintiff filed a grievance and was moved from DEP to OPM.

Plaintiff had no reason to doubt that this would be the case in this situation also.

(See Exhibit 81)

83. Admits.

84. Neither admits nor denies.

85. Neither admits nor denies.

86. Admits.

87. Admit.

88. Denies.  This is a clear representation of Defendant's harassment and

discrimination.  Defendant starts of with paragraph 88 stating that an

"anonymous" person filed a complaint with the CT Auditors of Public

Accounts. The Defendant goes on to state that this "anonymous" person was

(obviously the plaintiff herein). (See Exhibit 82) The Defendant has no facts to

base this statement on, however, Defendant has cleverly inserted this mistruth

into and surrounding information that is true.  This tactic has been used

throughout Defendant's 56(a)1 Material Facts and is in itself unprofessional.

(See Exhibit 83)

89. Denies. The union representative, Joseph Zakrzewski proposed a full

investigation that supported the fact that CHRO violated state law by hiring

Herbertia Williams of T.Ball & Associates to investigate the allegations. (See

Exhibit 84)

90. Neither admits nor deny.

91. Neither admits nor denies. The advice from the Union was that reinstatement

or other state service employment would be a better alternative. This was the

case when Plaintiff filed a grievance and was moved from DEP to OPM.

Plaintiff had no reason to doubt that this would be the case in this situation also.

(See Exhibit 6)

92. Neither admits nor denies. Neither admits nor denies. The advice from the

Union was that reinstatement or other state service employment would be a

better alternative. This was the case when Plaintiff filed a grievance and was

moved from DEP to OPM. Plaintiff had no reason to doubt that this would be

the case in this situation also. (See Exhibit 8)

93. Admit.

94. Admit.

95. Admit.

96. Deny. Plaintiff's response was and still remains that she should have not been

criticized. The truth of the matter was that CHRO was misappropriating state

funds and Plaintiff was not going to go along with the criminal activity. When

Plaintiff was not getting a positive response or due process from her supervisor

or the next level up, Plaintiff sent her concern to the governor. Watts Elder

noted this fact and in an email sent to Linda Yelini she stated that Plaintiff sent

a "nasty gram" to the governor. (See Exhibit 85) This is proof of a conspiracy

to commit fraud against the Plaintiff by labeling her and discriminating against

her in retaliation of being constituted a whistle-blower.

97. Deny. The staff was trying to coerce Plaintiff into committing fraud and when

one order was given to disregard the truth, Plaintiff did not comply. (See

Exhibit 86). Defendants resorted to harassment and discrimination of Plaintiff

and Plaintiff grieved each discriminatory act and responded to investigations of

inappropriate conduct and behavior. Plaintiff also asked for a transfer out of

Ms. Appleton's department and was denied. (See Exhibit 87) The detrimental

effect on the business office was the fact that there were some CHRO

employees who were guilty of misconduct with regard to state funds and

Plaintiff stated such and would not be a party to such. (See Exhibit 88) In

direct violation of the Local 4200 union rules, Defendant, Ms. Appleton

continued to discriminate and harass Plaintiff. Watts Elder and union Joseph

Zakrzewski was aware of this. Union steward Joseph Zakrzewski sent

numerous emails to show Defendant's disregard for due process and the

flagrant discrimination against Plaintiff. (See Exhibit 89) Defendant was in

fact, misappropriating funds, and audits of CHRO inventory continued to show

a deficit.  Ms. Appleton continuously told Plaintiff that she was the one in

charge and she was not to question discrepancies or misappropriations even

though it was obvious that fraudulent activity was being conducted during the

time that Plaintiff was employed under Ms. Appleton. (See Exhibit 91)

98.  Neither admits nor denies.  Plaintiff was not privy to that information.

99.  Admit.

100. Admit.

101. Admit.

PLAINTIFF,

LEONYER M. RICHARDSON


By:_____
Cynthia R. Jennings, Esq.
THE BARRISTER LAW GROUP, LLC
211 State Street
Bridgeport, CT 06604
(203) 334-4800 (O)
(203) 368-6985 (Fax)
Federal Bar No. ct21797

## <u>CERTIFICATION</u>

This is to certify that a copy of Plaintiff's Memorandum of Law, Local Rule 56(b)

Statement and Exhibits in Opposition to Defendant, State of Connecticut, et al's

Summary Judgment Motion and 56(a) Statement was  hand delivered  on September 27,

2004,  to the Court and  the Attorney General's office and sent via U.S. Mail to all other

Counsel of  Record as shown below:

Joseph A. Jordano
Assistant Attorney General
Office of the Attorney General
55 Elm Street
Hartford, CT 06141

Jack V. Genovese II
Genovese, Vehslage & LaRose
500 Enterprise Drive
Rocky Hill, CT 06067

Brian A. Doyle
Ferguson, Doyle & Springer
35 Marshall Rd.
Rocky Hill, CT 06067

Cynthia R. Jennings, Esq.,