UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

Leonyer M. Richardson           :
    Plaintiff               :
                  :      2005 MAR 31  P 3: 25

                  :      US DISTRICT COURT
VS.                             :      Civil No. 3:02CV0625(AVC)    HARTFORD CT
                  :
STATE OF CONNECTICUT            :
COMMISSION ON HUMAN RIGHTS,     :
OFFICE OF POLICY AND            :
MANAGEMENT, CFEPE-AFT,          :
AFL-CIO, ET AL.                 :
    Defendants              :

## RULING ON THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This is an action for damages and equitable relief brought
in connection with a failed employment relationship.  The
complaint alleges disparate treatment in employment based on race
and retaliation for engaging in protected activity.
The action is brought pursuant to 42 U.S.C. §§ 1981 and 1983 and
alleges violations of the Fourteenth Amendment to the United
States Constitution, Title VII of the Civil Rights Act of 1964,
as amended ("Title VII"), 42 U.S.C. § 2000e, et seq, at §§ 2000e-
2 and 3, and the Connecticut Fair Employment Practices Act
("CFEPA"), C.G.S. §§ 46a-58(a), 60(a)(1),(4) and (5).

The defendants, State of Connecticut Commission on Human
Rights ("CHRO"), Office of Policy and Management ("OPM"), Leanne
Appleton, and Cynthia Watts-Elder now move pursuant to Rule 56 of
the Federal Rules of Civil Procedure for summary judgment,
asserting that there are no genuine issues of material fact and

that they are entitled to judgment as a matter of law. The issues presented are whether the plaintiff, Leonyer M. Richardson, has raised a genuine issue of material fact: (1) that the defendant, CHRO, has violated Title VII under the theories of disparate treatment and retaliation; (2) whether the defendants, Appleton and Watts-Elder have violated Richardson's rights as secured by the equal protection clause of the Fourteenth Amendment to the United States Constitutional and 42 U.S.C. § 1981; (3) whether the defendant, OPM, has violated Title VII under the aforementioned theories; and (4) whether the CHRO and the OPM have violated the CFEPA.

For the reasons that hereafter follow, the motion is GRANTED.

## FACTS

Examination of the complaint, affidavits, pleadings, Rule 56(c) statements, and exhibits accompanying the motion for summary judgment, and the responses thereto disclose the following undisputed, material facts.

The plaintiff, Leonyer Richardson, is an African American woman who has been employed by the state of Connecticut for many years. In 1981, she began her career as a clerk typist for the Connecticut Department of Environmental Protection ("DEP"). At some point, DEP promoted her to the position of fiscal administrative officer. In 1997, Richardson left DEP for a

position with the Connecticut Office of Policy and Management
("OPM").  Just prior to leaving, one Richard Clifford, Chief of
the Bureau of Outdoor Recreation, gave Richardson a written
reprimand for allegedly exhibiting "offensive or abusive conduct
toward . . . co-workers."  While at the DEP, Richardson met the
defendant, Cynthia Watts-Elder, also an African American woman.
Watts-Elder later became Richardson's senior supervisor at the
CHRO.

     In November of 1997, on a recommendation from Watts-Elder,
Richardson transferred to OPM as a fiscal administrative officer.
On May 30, 2000, Richardson filed her first complaint of
discrimination with CHRO against the defendant, OPM, in which she
alleged being the victim of a hate crime because her desk had
been "ram shacked" repeatedly.  The complaint also alleged that
her supervisors racially discriminated against her by harassing
her in various ways on the job.  OPM denied every one of the
allegations.  Richardson eventually withdrew her complaint.

     In 2000, Watts-Elder, who was then acting Executive Director
of CHRO, agreed to accept Richardson as a transfer employee from
OPM.  On October 6, 2000, Richardson transferred to CHRO, again
in the capacity of fiscal administrative officer.  The defendant,
Leanne Appleton, a caucasian woman, was assigned as Richardson's
direct supervisor.  In Watts-Elder's view, Appleton is a highly
competent business manager.  According to Richardson, however,

many of Appleton's employees felt as though Appleton was discriminatory and demeaning.

On February 22, 2001, Appleton issued Richardson a written warning.  The warning admonished Richardson for violating a direct order prohibiting computer use with another person's user-id and password.  The warning also informed Richardson that Appleton was scheduling a series of meetings to discuss work requirements, and that Richardson had the right to union representation at these meetings.

On April 6, 2001, Appleton once again reprimanded Richardson with a written warning, asserting that she violated a direct order against contacting the comptroller's office, and another order regarding workplace conduct, including unacceptable e-mail, rude telephone calls, and abrupt notes.

On April 30, 2001, Richardson filed her first grievance against Appleton, accusing her of issuing a written warning without just cause, and of abusive, arbitrary, and discriminatory conduct.

In May, 2001, a dispute arose between Richardson and Appleton regarding the proper method for calculating energy consumption in various reports.  According to Richardson, Appleton's calculations resulted in the misappropriation of funds from CHRO.  After consulting with OPM, Appleton informed Richardson that the method Richardson had been using was

4

incorrect and to use the correct formula in all future

calculations.

On July 3, 2001, a dispute arose between Richardson and

Appleton concerning Richardson's method of making bank deposits.

On the same day, Richardson sent the following e-mail to Watts-

Elder defending her position:

> I have proof that the deposits have always
> been done this way.  I have made deposits
> according to what I was told to do when I
> first arrive here [sic], and that was "we (CHRO)
> do not do things like OPM does."  I was told
> to make deposits based on receiving monies
> that was $500.00 or more.  When I began to
> explain that I use [sic] to do deposits every week
> at OPM, it was then I was told that CHRO does
> things differently.
>
> Remember in the meeting we had with [Appleton],
> you and myself.  She quoted that state
>
> This is retaliation on Leanne Appleton's part.
> She wants to make this a [Richardson's] issue,
> when in actuality, [Appleton] is responsible
> for allowing this to happen prior years.
>
> The last audit shows that.  I probably have made
> deposit correctly than anyone before me.  At least,
> I have done the deposits on a regular time fame [sic].
>
> This business office has been run terribly.  I have
> never seen anything like it before in all of my 20
> some years of state service.
>
> [Richardson]

On July 5, 2001, Richardson filed a second grievance against

Appleton, again accusing her of being abusive, arbitrary, and

discriminatory.  According to Richardson, Appleton had singled

her out with regard to untimely bank deposits and abuse of sick time. Richardson claims that another CHRO employee, one Kathy Stone, was also accused of making untimely bank deposits but was not disciplined.

On July 17, 2001, Appleton issued a third written warning to Richardson, this time alleging a violation of a directive requiring Richardson to explain 52 alleged untimely deposits and her failure to follow comptroller guidelines.

Meanwhile, Richardson's ultimate supervisor, Watts-Elder, hired one Herbetia Williams, an African American woman, to investigate Richardson's alleged misconduct. Later in July of 2001, Williams submitted her report, finding that Richardson had engaged in willful misconduct, stating:

> (1). [Richardson's] behavior clearly violates the Workplace Conduct Policy.
>
> (2). [Richardson's] behavior has created a hostile and chilling work environment.
>
> Examples include: screaming and slamming things; speaking to her supervisor in a loud voice; use of aggressive non-verbal communication; shaking her finger in Leanne's face; and constantly interrupting when others talk.

On July 30, 2001, Richardson filed a complaint with CHRO against CHRO alleging that the actions[1] taken by Appleton were both discriminatory and retaliatory. The CHRO dismissed the

---

[1] In her complaint, Richardson alleges "I have been discriminated against by Ms. Appleton because I have encountered 'character assassination' of her 'hostile, abusive, harassment, retaliation and arbitrary conduct against me in the workplace.'"

complaint on March 15, 2002 finding that "there is no reasonable possibility that further investigation will result in a finding of reasonable cause."

From August 6, 2001, to August 20, 2001, Watts-Elder placed Richardson on administrative leave for 10 days, this time without pay, alleging "offensive and abusive conduct towards co-workers, theft, misuse of state funds, property, or equipment. On August 20, 2001, when Richardson returned, Appleton asked her to prepare the August Energy Consumption Report using the correct calculation.

On September 19, 2001, Richardson responded by filing a third grievance accusing Appleton and CHRO staff of continuing "a pattern of lies, misrepresentations, ostracism, accusations. . . ," and placing a written warning in her personnel file without regard to her contract rights and for singling her out in an arbitrary manner. On September 6, 2001, Richardson also filed a complaint with EEOC against CHRO. On October 16, 2001, Watts-Elder fired Richardson "as a result of her insubordination and offensive conduct towards co-workers and supervisors."

Pursuant to her union contract, Richardson filed a grievance with respect to her job termination. On October 22, 2001, a hearing was held. Upon discovering that Richardson had amended her second complaint against CHRO to include an allegation of race discrimination regarding her termination, Richardson's

7

union, A & R Local 4200 ("A & R"), withdrew its appeal of her grievance, as complaints of unlawful discrimination filed with CHRO are not subject to arbitration under the union contract.

On February 7, 2002, Richardson filed a complaint with the Auditors of Public Accounts ("APA") against CHRO alleging that CHRO violated state law by assigning Williams, who was not licensed as an investigator in Connecticut, to conduct the investigation of July, 2001, that resulted in a finding of willful misconduct.  In response, the APA concluded that "a license is not required to review personnel matters, which apparently was what [Williams] did"

On April 9, 2002, Richardson filed a complaint with CHRO against her union (A & R Local 4200), alleging that "in withdrawing its request to arbitrate my grievances because I had filed complaints of discrimination and retaliation with the CHRO and the EEOC, the union has discriminated against me . . ."  On September 4, 2002, CHRO dismissed the amended complaint on the grounds that "the Respondent's actions were in accordance with the union contract."

On April 9, 2002, Richardson filed a fourth complaint with CHRO, this time against OPM alleging that by executing a collective bargaining agreement with the A & R union (which provided that her discrimination complaints were not arbitrable if she also filed a CHRO complaint), that "OPM and the union have

discriminated against me." On September 4, 2002, CHRO dismissed Richardson's complaint against OPM on the grounds that "there is no reasonable possibility that further investigation could result in a finding of reasonable cause" because "the Respondent's actions were in accordance with the union contract."

Shortly after Richardson was fired, she applied for unemployment benefits, which were contested by CHRO on the grounds that Richardson was fired for misconduct. The issue of whether CHRO discharged Richardson for willful misconduct was brought before the state of Connecticut Employment Security Appeals Division ("SAD"). Hearings were held before Appeals Referee Lee Ellen Terry, in which many witnesses testified under oath and were cross-examined by counsel. Richardson was represented by her attorney. Following an extensive investigation, the Appeals Referee concluded that:

> the employer, Commission on Human Rights and
> Opportunities – State of Connecticut, discharged
> the claimant, Leonyer M. Richardson, for *deliberate*
> *misconduct which constituted willful misconduct* in the
> course of her employment. As a result, the claimant
> [Richardson] is disqualified from receiving
> unemployment compensation benefits. . . ."

On Appeal, the Board of Review issued a 6 page decision which affirmed the Referee's ruling in full.

On April 18, 2000, Richardson filed this lawsuit.

9

## STANDARD

On a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute, and that it is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute regarding a material fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir.), cert. denied, 506 U.S. 965, 113 S.Ct. 440, 121 L.Ed.2d 359 (1992) (quoting Anderson, 477 U.S. at 248, 106 S.Ct. 2505). The court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." Aldrich, 963 F.2d at 523. Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

## DISCUSSION

### I.    Count I: Title VII Violations Against The CHRO.

The complainant alleges Title VII violations against CHRO under two theories: (1) disparate treatment; and (2) retaliation for engaging in protected activity. The court considers each in turn.

1. Disparate Treatment

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race. . ." 42 U.S.C. § 2000e-2(a)(1).

The analysis for a disparate treatment claim, which requires proof of discriminatory intent or motive, is governed by the well known McDonnell Douglas framework. See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). The Supreme Court has summarized the procedure as follows:

> First, the plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the [adverse employment decision]. . ." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981) (quoting McDonnell Douglas, 411 U.S. at 802, 804).

A. The Prima Facie Case

To make out a prima facie case of disparate treatment, a plaintiff must show that: (1) she belongs to a protected class; (2) she was performing her duties satisfactorily; (3) the defendant took adverse action against her; and (4) the adverse

11

action occurred under circumstances giving rise to an inference of discrimination. See e.g. Dister v. Continental Group, Inc. 859 F,2d 1108, 1114 (2d Cir. 1988); Woroski v. Nashua Corp., 31 F.3d 105, 108 (2d Cir. 1994); McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997). The burden that an employment discrimination plaintiff must meet in order to defeat summary judgment at the prima facie stage is de minimis. McLee, 109 F.3d at 134.

For purposes of discussion only, the court will assume that the plaintiff has made out a prima facie case of race discrimination, in that her race is protected by Title VII, she was performing her duties satisfactorily, and the CHRO did, indeed, take adverse action against her, including issuing her three written warnings, suspending her two times, and eventually terminating her employment.

B. The Defendant's Non-Discriminatory Reason

To rebut an inference of discrimination established by the plaintiff's prima facie case, the defendant must articulate a legitimate, non-discriminatory reason for the adverse employment action. Johnson v. Palma, 931 F.2d 203, 207 (2d Cir. 1991). The defendant must state a "clear and specific" reason. Meiri v. Dacon, 759 F.2d 989, 997 (2d. Cir. 1985). Here, the CHRO has stated that it took the actions condemned because of the plaintiff's "insubordination, poor performance, and violence in

12

the workplace." The court is satisfied that the defendant has sufficiently rebutted the inference of discrimination raised by the plaintiff's prima facie case.

C. Pretext/Discrimination

In the final stage of the McDonnell Douglas analysis, the burden shifts back to the plaintiff to show by a preponderance of the evidence that the reason articulated by the defendant for the adverse action was false, and that the real reason for the action was illegal discrimination. Saulpaugh v. Monroe Community Hospital, 4 F.3d 134, 141 (2d Cir. 1993). The plaintiff has failed to meet this burden.

In support of her race discrimination claim, Richardson argues that she "is aware of other similarly situated employees, namely, one Kathy Stone, who was accused of the same work misgivings as the plaintiff and was not disciplined." However, Richardson has offered no evidence to support this contention. The record contains nothing more than an email that Richardson herself sent to Watts-Elder on July 3, 2001, defending her method of making monetary deposits – a method that subjected Richardson to discipline in the form of a written warning.[2]

This evidence cannot satisfy the burden of proving pretextual discrimination where, as here, there is overwhelming

---

[2] On July 17, 2001, Appleton issued Richardson a written warning for "violation of a directive to provide explanation for 52 untimely deposits and failure to follow comptroller guidelines."

13

evidence of her insubordination and hostile behavior supporting

the CHRO's legitimate business reason for the warnings,

suspension and employment termination.  See e.g., Getschmann v.

James River Paper Co., Inc., 822 F. Supp. 75, 78 (D. Conn. 1993)

(favorable prior work performance and two discriminatory

statements by a supervisor were "too slender a reed to carry the

weight of the charge" at summary judgment where there was

overwhelming evidence of legitimate business reason).  The

overwhelming evidence here includes a finding by the Connecticut

Employment Security Appeals Division that Richardson was fired

"for deliberate misconduct which constituted willful misconduct

in the course of her employment."  The record also includes a

finding by independent investigator, Williams, that "[the

plaintiff's] behavior clearly violates the Workplace Conduct

Policy."  Specifically, Williams found that:

> [the plaintiff's] behavior has created
> a hostile and chilling work environment.
> Examples include: screaming and slamming
> things; speaking to her supervisor in a
> loud voice; use of aggressive non-verbal
> communication; shaking her finger in Leanne's
> face; and constantly interrupting when others talk.

Particularly troublesome to Richardson's case is the fact

that her several suspensions and job termination were at the

behest of Watts-Elder, herself an African American woman, but

more importantly, the same person who recommended Richardson to

the OPM in 1997 and then facilitated Richardson's transfer to the

14

CHRO in 2000.  Accordingly, the CHRO is entitled to judgment as a matter of law on the race discrimination claim.

## 2. Retaliation

Title VII also makes it unlawful "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII]."  42 U.S.C. § 2000e-3(a).

The McDonnell Douglas burden shifting framework which is applicable to claims of disparate treatment also applies to claims of retaliation.  See Richardson v. N.Y. State Dep't. of Correctional Service, 180 F.3d 426, 443 (2d. Cir. 1999).

> In the context of a motion for summary judgment, the plaintiff must first demonstrate a prima facie case of retaliation, after which the defendant has the burden of pointing to evidence that there was a legitimate, nonretaliatory reason for the complained action.  If the defendant meets its burden, the plaintiff must demonstrate that there is sufficient potential proof for a reasonable jury to find the proffered legitimate reason merely a pretext for impermissible retaliation.  Id.

## A. The Prima Facie Case

"To establish a prima facie case of retaliation, a plaintiff must show: (1) participation in a protected activity that is known to the defendant; (2) an employment decision or action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse decision."  Id.

## (i) Known Protected Activity

15

The plaintiff has argued that she engaged in protected activity on at least four occasions: (a) when she filed her first grievance against Appleton on April 30, 2001; (b) when she filed her second grievance against Appleton on July 5, 2001; (c) when she filed a complaint against the CHRO with the CHRO on July 30, 2001; and (d) when she filed a complaint against the CHRO with the APA concerning Williams' investigation.

(ii) Adverse Employment Action

Richardson claims the CHRO retaliated against her in three ways: (a) by issuing her three written warnings; (b) by suspending her two times; and (c) by terminating her employment.

(iii) Causal Connection

The court will assume for purposes of discussion only that the plaintiff has established a causal relationship.

B. The Defendant's Non-Discriminatory Reason

To rebut an inference of retaliation established by the plaintiff's prima facie case, the defendant must articulate a legitimate, non-discriminatory reason for the adverse employment action. Johnson v. Palma, 931 F.2d 203, 207 (2d Cir. 1991). The defendant must state a "clear and specific" reason. Meiri v. Dacon, 759 F.2d 989, 997 (2d. Cir. 1985).

Although Richardson has established a prima facie case of retaliation, the defendant has countered with a legitimate non-discriminatory reason for the alleged retaliation, "namely

16

insubordination, poor performance, and violence in the workplace." The court is satisfied that CHRO has sufficiently rebutted the inference of retaliation raised by Richardson's prima facie case.

## C. Pretext/Discrimination

In the final stage of the McDonnell Douglas analysis, the burden shifts back to the plaintiff to show by a preponderance of the evidence that the reason articulated by the defendant for the adverse action was false, and that the real reason for the action was retaliation. Saulpaugh v. Monroe Community Hospital, 4 F.3d 134, 141 (2d Cir. 1993). "[A] plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997). Here, Richardson's broad statements: "the reason [for the suspension] was false and pretextual because the plaintiff had never violated any such orders" and "On October 16, 2001, Watts-Elder terminated the plaintiff's employment for the same false and pretextual reasons," unsubstantiated by any corroborative evidence, are insufficient to show pretext. Accordingly, the CHRO is entitled to judgment as a matter of law on the retaliation claim.

## II.  Count Two: Race and Color Discrimination and Retaliation Against Defendants Appleton and Watts-Elder In Violation of 42 U.S.C. §§ 1981 and 1983 and the Connecticut Constitution.

In Count Two, Richardson alleges that Appleton and Watts-Elder violated her right to equal protection of the laws as secured by the Fourteenth Amendment.  She brings this action against Watts-Elder in her official capacity and against Appleton in her individual capacity pursuant to 42 U.S.C. §§ 1981 and 1983.

1. Watts-Elder In Her Official Capacity

The defendant argues that "the claim against Watts-Elder must be dismissed because [as a claim against Watts-Elder in her official capacity] it is barred by the 11th Amendment." Richardson does not contest this in her brief, but rather "requests leave to amend her complaint to cure the technical defect and reflect an action against defendant Cynthia Watts-Elder in her individual capacity."

The Eleventh Amendment of the United States Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.  "As interpreted, the Eleventh Amendment generally prohibits suits against state

**II.  Count Two: Race and Color Discrimination and Retaliation
Against Defendants Appleton and Watts-Elder In Violation of
42 U.S.C. §§ 1981 and 1983 and the Connecticut
Constitution.**

In Count Two, Richardson alleges that Appleton and Watts-
Elder violated her right to equal protection of the laws as
secured by the Fourteenth Amendment.  She brings this action
against Watts-Elder in her official capacity and against Appleton
in her individual capacity pursuant to 42 U.S.C. §§ 1981 and
1983.

1. Watts-Elder In Her Official Capacity

The defendant argues that "the claim against Watts-Elder
must be dismissed because {as a claim against Watts-Elder in her
official capacity] it is barred by the 11th Amendment."
Richardson does not contest this in her brief, but rather
"requests leave to amend her complaint to cure the technical
defect and reflect an action against defendant Cynthia Watts-
Elder in her individual capacity."

The Eleventh Amendment of the United States Constitution
provides that "[t]he Judicial power of the United States shall
not be construed to extend to any suit in law or equity,
commenced or prosecuted against one of the United States by
Citizens of another State, or by Citizens or Subjects of any
Foreign State."  U.S. Const. amend. XI.  "As interpreted, the
Eleventh Amendment generally prohibits suits against state

governments in federal court." <u>Richardson v. New York</u>, 180 F.3d

426, 447-48 (2d. Cir. 1999) (citing <u>Pennhurst State School &

Hosp. v. Halderman</u>, 465 U.S. 89 (1984). "This immunity also

extends to state officials sued in their official capacities."

<u>Alungbe v. Bd. of Trustees</u>, 283 F. Supp. 2d 674, 687 (D. Conn.

2003) (citing <u>Kentucky v. Graham</u>, 473 U.S. 159, 166 (1985)).

Because Richardson has sued Watts-Elder in her official

capacity only, the claims against Richardson are barred by the

Eleventh Amendment.  Further, because leave to amend may only be

granted at this juncture based upon argument under Fed. R. Civ.

P. 15(a), and no such argument is presented here, the court

declines to allow any such amendment.

2. Appleton In Her Individual Capacity

Appleton first argues that Richardson cannot prove a prima

facie case under 42 U.S.C. § 1981 because 42 U.S.C. § 1983 is the

exclusive remedy against state actors for the violation of

Constitutional rights.  Richardson does not respond to this

assertion.

A. Section 1981

Section 1981 provides, in relevant part, that "all persons

within the jurisdiction of the United States shall have the same

right . . . to make and enforce contracts, to sue, be parties,

give evidence, and to the full and equal benefit of all laws and

proceedings . . . as is enjoyed by white citizens . . ." 42
U.S.C. § 1981(a).

In <u>Jett v. Dallas Independent School District</u>, 491 U.S. 701
(1989), the Supreme Court held that "the express 'action at law'
provided by § 1983 for the 'deprivation of any rights,
privileges, or immunities secured by the Constitution and laws,'
provides the exclusive federal damages remedy for the violation
of the rights guaranteed by § 1981 when the claim is pressed
against a state actor." <u>Jett</u>, 491 U.S. at 735; <u>see also</u>
<u>Patterson v. County of Oneida</u>, 375 F.3d 206 (2d Cir. 2004) ("The
express cause of action for damages created by § 1983 constitutes
the exclusive federal remedy for violation of the rights
guaranteed in § 1981 by state governmental units"). Because
there is no dispute that Appleton is a state actor, the court
concludes that § 1983 provides the exclusive remedy for violation
of her constitutional rights.

B. Section 1983

Section 1983 allows an action against any "person who, under
color of any statute, ordinance, regulation, custom, or usage, of
any State . . . subjects, or causes to be subjected, any citizen
of the United States . . . to the deprivation of any rights,
privileges, or immunities secured by the Constitution and laws."
42 U.S.C. § 1983.

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and the laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988). If a defendant's conduct satisfies the state-action requirement of the Fourteenth Amendment, "that conduct [is] also action under color of state law and will support a suit under § 1983." Lugar v. Edmonson Oil Co., 457 U.S. 922, 935 (1982). "State employment is generally sufficient to render the defendant a state actor." Patterson, 375 F.3d 206, 230 (2d Cir. 2004). "Once action under color of state law is established, [Richardson's] equal protection claim parallels [her] Title VII claim. See Feingold v. New York, 366 F.3d 138, 159 (2d Cir. 2004). "[T]he elements of one are generally the same as the elements of the other and the two must stand or fall together." Id.

Here, Richardson alleges that "the actions of Appleton . . . were under color of law and violated Ms. Richardson's rights . . . to equal protection of the laws as protected by the Fourteenth Amendment to the U.S. Constitution . . . ." However, because Richardson has failed to raise a genuine issue of material fact as to her Title VII claims, her § 1983 claim must fail as well. Accordingly, Appleton is entitled to judgment as a matter of law on her claim of Constitutional violations.

21

## III. Count Three: Title VII Violations As Against The OPM

In Count Three, Richardson alleges that the OPM violated Title VII by "challenging the arbitrability of the Richardson grievances because she had filed complaints of discrimination and retaliation with the CHRO and the EEOC," and by "negotiating and executing provisions of a collective bargaining agreement that allowed the State, through OPM, to retaliate against employees, including Ms. Richardson."

OPM argues that "[Richardson's claim] . . . that her collective bargaining agreement ("CBA") violated the retaliation provisions of Title VII is misdirected." The defendant points out that the terms of Richardson's CBA preclude her from arbitrating discrimination claims once she has filed a CHRO complaint against OPM and also that the Federal Arbitration Act ("FAA") gives great deference to parties' agreements not to arbitrate. The CBA states, in pertinent part:

> Notwithstanding any other provisions of this
> agreement, the following matters shall be subject
> to the grievance procedure but not to arbitration:
>
> . . .
>
> (2) disputes over claimed unlawful discrimination
> shall be subject to the grievance procedure
> but shall not be arbitrable if a complaint
> is filed with the Commission on Human Rights
> and Opportunities arising from the same
> common nucleus of operative fact.

Richardson does not contest the preclusive language of the CBA, but argues instead that "Richardson's action is not barred by the FAA."

The Federal Arbitration Act ("FAA") provides, in relevant part, that a written provision in "a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. According to the Supreme Court, "[t]he FAA directs courts to place arbitration agreements on equal footing with other contracts, but it 'does not require parties to arbitrate when they have not agreed to do so.'" EEOC v. Waffle House, 534 U.S. 279, 293 (2002) (citing Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ., 489 U.S. 468, 478 (1989)).

Here, Richardson and her Union have not agreed to arbitrate – the CBA includes an express provision not to arbitrate. The provision does not violate the FAA, and it cannot give rise to an inference that OPM, by enforcing the terms of the CBA, was motivated by a discriminatory animus. Accordingly, OPM is entitled to judgment as a matter of law on the Title VII claim.

IV.  **Counts One and Three: CFEPA Violations Against The CHRO and The OPM.**

In Counts One and Three, Richardson alleges that the CHRO and the OPM violated the CFEPA by discriminating against her on the basis of her race and color and because she previously opposed and filed complaints of race and color discrimination.

CHRO and OPM respond, however, that Richardson's state law claims against them are barred by the Eleventh Amendment because Connecticut has not waived its immunity in federal court. Richardson does not respond to this assertion.

The Eleventh Amendment of the United States Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.  "As interpreted, the Eleventh Amendment generally prohibits suits against state governments in federal court."  <u>Richardson v. New York</u>, 180 F.3d 426, 447-48 (2d. Cir. 1999) (citing <u>Pennhurst State School & Hosp. v. Halderman</u>, 465 U.S. 89 (1984)).  "This immunity also extends to state officials sued in their official capacities."  <u>Alungbe v. Bd. of Trustees</u>, 283 F. Supp. 2d 674, 687 (D. Conn. 2003) (citing <u>Kentucky v. Graham</u>, 473 U.S. 159, 166 (1985)).  "This protection presupposes: (1) that each state is a sovereign

24

entity in our federal system; and (2) that it is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent." Close v. New York, 125 F.3d 31, 36 (2d. Cir. 1997) (citing Seminole Tribe v. Florida, 517 U.S. 44 (1996)).

Eleventh Amendment immunity is not absolute, however. "To the contrary, a state may be divested of immunity and haled into federal court in one of two ways: (1) Congress may abrogate the sovereign immunity through a statutory enactment; or (2) a state may waive its immunity and agree to be sued in federal court." Richardson, 180 F.3d at 448 (citing Fitzpatrick v. Bitzer, 427 U.S. 445, 452-56 (1976); Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 238 (1985)). "The test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one." Id. (citing Atascadero, 473 U.S. at 241). "The fact that a state has consented to suit in the courts of its own creation does not mean that it consents to suit in federal court." Page v. Connecticut Dep't of Public Safety, 185 F. Supp. 2d 149, 159 (D. Conn. 2002) (citing Smith v. Reeves, 178 U.S. 436, 441-45 (1900)). Stated differently: "A state may consent to suit in its own courts without consenting to suit in federal court." Alungbe, 283 F.Supp. 2d at 687 (citing Smith, 178 U.S. at 441-45).

Connecticut law provides that:

> Any person who has timely filed a complaint with
> the Commission on Human Rights and Opportunities
> in accordance with section 46a-82 and who has
> obtained a release from the commission in accordance
> with section 46-83a or 46a-101, *may also bring*
> *an action in the superior court* for the judicial
> district in which the discriminatory practice is
> alleged to have occurred or in which the respondent
> transacts business, except any action involving
> a state agency or official may be brought in the
> superior court for the judicial district of Hartford.

(Italics added) Conn. Gen. Stat. § 46a-100.  "Under Connecticut

law, Connecticut waived its immunity for suit in state court for

CFEPA claims.  But it has not clearly expressed a waiver to suit

in federal court.  Therefore, the courts of this district have

consistently found that CFEPA claims against the state or its

agents are barred by the Eleventh Amendment."  Alungbe, 283 F.

Supp. 2d at 687 (citing e.g. Lyon v. Jones, 168 F. Supp. 2d 1, 6

(D. Conn. 2001)).  Accordingly, the CHRO and the OPM are entitled

to judgment as a matter of law on the state law claims.

**Count IV: Retaliation against Defendants Yelmini and Bardot in**
**violation of 42 U.S.C. §§ 1981 and 1983 and the Connecticut**
**Constitution.**

Because Richardson has not addressed these allegations in

her brief, she has failed to raise a genuine issue of material

fact as to Count IV.  Accordingly, the defendant's motion for

summary judgment is GRANTED as to Count IV.

## CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment (document no. 37) is hereby GRANTED.

It is so ordered this 31st day of March, 2005, at Hartford, Connecticut.

_____

Alfred V. Covello
United States District Judge

27